849 A.2d 1185

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Edward S. ROGERS, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 6, 2001.

Decided May 27, 2004.

130

Andrea Konow, Bruce A. Carsia, for Edward Stanley Rogers.

Patricia Jo McLean, Butler, Timothy Jon Barker, York, Timothy F. McCune, Butler, for Com.

Before CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## *OPINION*

Chief Justice CAPPY.[1]

The issues with which we are presented question whether the police legally detained Edward Rogers ("Appellant") and executed a canine search of Appellant's vehicle. For the following reasons, we now affirm.

On January 9, 1998, Trooper Michael Banovsky of the Pennsylvania State Police observed Appellant's vehicle traveling southbound on Interstate 79, passing other traffic.[2] The trooper positioned his vehicle behind Appellant's, and followed him for 4/10ths of a mile, clocking his speed at 73 mph in a 55 mph zone. Trooper Banovsky also noticed that the vehicle had an expired Tennessee temporary registration plate.

1. This case was reassigned to this author.

2. For the purpose of resolving the legal issues raised at the suppression hearing, the Commonwealth and Appellant stipulated to the facts contained in Trooper Banovsky's report. N.T., 3/03/1999, at 6–7.

Based on his observations, Trooper Banovsky initiated a traffic stop.[3]

Upon approaching Appellant's vehicle, Trooper Banovsky observed that Appellant was extremely nervous. In fact, Appellant was trembling so badly he had difficulty retrieving relevant documents for the trooper's examination. Appellant stated that he had just purchased the vehicle in Tennessee and was on his way to return it to the seller. Appellant also volunteered that he had structured the purchase of the vehicle in such a fashion that if anything was "shaky", he could return the vehicle.

The documents Appellant produced were incomplete or plainly false in many respects. For example, the Tennessee Certificate of Title extension form lacked the name of the transferee and the odometer reading. Also, the Tennessee Department of Revenue form was signed by "Edward Stanley" and listed an incorrect Pennsylvania address. Appellant stated that he knew that the Pennsylvania address listed on the form was false, but said that he placed it on the form at the behest of the seller of the vehicle.

Trooper Banovsky inquired about Appellant's travel plans, specifically asking about his origin and destination. Appellant stated that he had just left a friend's house in Butler, Pennsylvania, but was unable to recall the address of that friend. During the conversation with Appellant, Trooper Banovsky noticed that in the backseat of Appellant's vehicle there was an open box of "Tide" powdered laundry detergent, an open box of "Bounce" fabric softener dryer sheets, and a used roll of "Scotch" packaging tape.

At this juncture, Trooper Banovsky requested that Appellant get out of his automobile. Trooper Banovksy asked if he could search Appellant's vehicle. Appellant refused, stating that he himself had not yet searched the vehicle; Appellant volunteered that he had not yet had the opportunity to determine whether there was anything in the door panels or air vents of the vehicle. Trooper Banovsky then radioed a re-

---

3. There is no allegation that this initial traffic stop was improper.

quest for a criminal history check of Appellant. The check revealed that Appellant had a prior drug conviction. Trooper Banovsky proceeded to detain Appellant and requested that a canine unit be deployed to the scene.[4]

Allegheny County Police Officer Kent Maier and a canine named Rosie responded to the scene. Rosie checked the exterior of the vehicle and signaled a positive alert at the driver's door. Rosie then jumped, without prompting, inside the open driver's window and alerted the officers to the possible presence of drugs in the right rear of the vehicle. Based upon the positive results of the canine search, the police secured Appellant's vehicle and towed it to the police barracks. At the barracks, a second dog sniff was conducted by another canine; this search also yielded positive results. Subsequently, Trooper Banovsky obtained a search warrant. A search of the vehicle uncovered fifty-two pounds of marijuana.

Appellant was arrested and charged with Possession with the Intent to Deliver a Controlled Substance,[5] Possession of a Controlled Substance,[6] and Possession of Drug Paraphernalia.[7] Appellant was also charged with violating the Pennsylvania Vehicle Code by driving with an expired registration plate and speeding at a rate of 73 mph in a 55 mph zone.[8]

Appellant filed a motion to suppress all statements and physical evidence the police obtained incident to his detention and arrest. He asserted that the police illegally detained him for investigative purposes and that his vehicle was illegally searched in violation of his constitutional rights. At the suppression hearing, the parties stipulated to the testimony that would have been presented by submitting to the court relevant portions of the police reports and other documents.

4. The Commonwealth has conceded that at this juncture, Appellant was subject to an investigative detention.

5. 35 P.S. § 780–113(a)(30).

6. 35 P.S. § 780–113(a)(16).

7. 35 P.S. § 780–113(a)(16).

8. 75 Pa.C.S. §§ 1301 and 3362(a)(2), respectively.

The suppression court concluded that Trooper Banovsky's investigative detention of Appellant was illegal because it was not supported by reasonable suspicion that criminal activity was afoot. The court also found that the warrantless canine search of the vehicle was illegal because there was no reasonable suspicion that Appellant was involved in drug trafficking.

The Superior Court reversed. *Commonwealth v. Rogers,* 741 A.2d 813 (Pa.Super.Ct.1999). The Superior Court concluded that there was reasonable suspicion that Appellant was committing a criminal act to support the detention and the search. *Id.* at 817–18. In arriving at this conclusion, the court focused on the fact that there were opened laundry supplies and packaging tape in the back seat of Appellant's car, items that Trooper Banovsky knew from his experience as a narcotics officer were used in the packaging of certain illegal drugs. The court also noted that Appellant was extraordinarily nervous at being stopped by Trooper Banovsky, and that the paperwork on his vehicle was incomplete and fraudulent. The Superior Court concluded that the totality of the circumstances gave rise to reasonable suspicion, and that the detention was therefore legal. *Id.* Utilizing the same set of facts, the Superior Court also determined that the dog sniff of Appellant's vehicle was valid. *Id.* 818–20.

Appellant then filed a petition for allowance of appeal with this court, which we granted.

■ On appeal, Appellant complains that his federal and state constitutional rights to be free from unreasonable searches and seizures have been violated. He raises two separate issues. The first is whether Trooper Banovsky had reasonable suspicion to detain Appellant beyond the initial traffic stop. He contends that after Trooper Banovsky issued the traffic citations, the detention should have ceased as the trooper had no reasonable suspicion that criminal activity was afoot. Appellant concludes that as he was detained without reasonable suspicion, then he was seized in violation of the

Fourteenth Amendment to the United States Constitution and Article I, § 8 of the Pennsylvania Constitution.[9]

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight . . . to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676.

In the matter *sub judice*, Trooper Banovsky stated that when he approached the vehicle, Appellant was extremely nervous. In fact, Appellant was trembling so badly he had difficulty retrieving his license from his wallet. Also, the paperwork for Appellant's car was conflicting, incomplete and in some instances plainly fraudulent. Furthermore, while Appellant claimed that he had just departed a friend's house in Butler, he could not recall the address. Additionally, Trooper Banovsky noted open boxes of laundry supplies as well as packaging tape in the back seat of the car; Trooper Banovsky knew from his experience investigating drug offenses that these items were commonly used in the packaging and distribution of controlled substances.[10]

---

9. We note that in asserting that he was illegally detained, Appellant does not contend that his rights under the Pennsylvania Constitution are in some fashion broader than those under the federal constitution.

10. Appellant asserts that there is no record evidence that Trooper Banovsky was experienced in investigating narcotics offenses. Appel-

 Of course, one can conceive of innocent explanations for each one of these facts. Yet, as noted *supra*, reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further. *See Cook, supra.* Rather, the test is what it purports to be—it requires a *suspicion* of criminal conduct that is reasonable based upon the facts of the matter. The facts of the matter *sub judice* give rise to just such a suspicion. Appellant was unusually agitated; the paperwork for his vehicle was out of order in several key respects; his answers regarding the location he had just departed were vague; and, most importantly, the back seat of his car contained products that Trooper Banovsky knew, via his extensive professional experience, are commonly used in the packaging of illegal narcotics. These facts, taken in their totality, lead to a conclusion that Trooper Banovsky had reasonable suspicion to suspect that criminal activity was afoot. Thus, Appellant's first claim for relief fails.

Appellant next contends that even if the stop was supported by reasonable suspicion, the canine search of his vehicle was illegal pursuant to Article I, § 8 [11] of the Pennsylvania Constitution. Appellant asserts that probable cause is required before a canine sniff of an automobile may be conducted, and that standard was not met here.[12]

 In addressing the constitutionality of the canine sniffs in the matter *sub judice*, we begin with the premise that pursuant to the constitution of this Commonwealth, a canine sniff is a search. *Commonwealth v. Johnston*, 515 Pa. 454,

---

lant's brief at 17 n. 7. This assertion is incorrect. The record reveals that Trooper Banovsky participated in over 100 narcotics investigations. Affidavit of Probable Cause, dated January 9, 1998.

11. Article I, § 8 of the Pennsylvania Constitution provides in pertinent part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...." Pa. Const. art. I, § 8.

12. Appellant does not contend that there need also be exigent circumstances before a warrantless canine sniff of the vehicle may be conducted. As this issue was not raised, we will not address it. We caution the bench and bar that nothing in our opinion should be construed as commenting on the exigency issue.

530 A.2d 74, 79 (1987). Yet, this type of search is not treated like other searches as it "is inherently less intrusive upon an individual's privacy than other searches...." *Id.* We have noted that "this particular surveillance technique amounts to a relatively minor intrusion upon privacy, much less than is involved, say, in the physical entry and ransacking of a house in an effort to find a quantity of narcotics." *Id.* Thus, we held that there need not be probable cause to conduct a canine search of a place; rather, the police need merely have reasonable suspicion for believing that narcotics would be found in the place subject to the canine sniff. *Id.*

This calculus shifted, however, when we were confronted with an instance in which the subject of the search was not a place but rather was a person. *See Commonwealth v. Martin,* 534 Pa. 136, 626 A.2d 556 (1993). In *Martin,* we were unwilling to allow a canine sniff of a person to be conducted upon a mere showing of reasonable suspicion. We stated that "an invasion of one's person is, in the usual case, [a] more severe intrusion on one's privacy interest than an invasion of one's property." *Martin,* 626 A.2d at 560. We emphasized that the "principal object [of the constitutional provisions against unreasonable searches and seizures] is the protection of privacy rather than property...." *Id.* (citations and internal quotation marks omitted). Thus, we held that while reasonable suspicion was sufficient to conduct a canine sniff of a place, that was too low a level of suspicion when a person, rather than a place, is to be subjected to a canine sniff. When the sniff is of a person, the *Martin* court required that "the police must have probable cause to believe that a canine search of a person will produce contraband or evidence of a crime." *Id.*[13]

---

**13.** Our learned colleague in his concurring opinion raises the question of whether this court should abandon the distinction between canine sniffs of people and canine sniffs of places which was drawn by our decisions in *Johnston* and *Martin.* *See Rogers,* J–47–2001 (Castille, J., concurring). While it may behoove this court to revisit whether the distinctions created by *Johnston* and *Martin* are logical ones, we do not believe this matter presents the best vehicle to do so. The parties in this matter have not raised the argument that we should wholesale abandon our prior line of cases; rather, they confine themselves to

 With the *Johnston* and *Martin* standards in mind, we turn to examining whether Rosie's sniffing of the exterior and interior of Appellant's car passes constitutional muster.[14] We first consider her sniffing of the exterior of the car, which lead to a positive alert at the driver's side door, as this occurred first in time.[15] We agree with the Superior Court that Rosie's sniffing the exterior of Appellant's vehicle need be supported merely by reasonable suspicion. *Id.* 818–20, 626 A.2d 556. Unlike the expectation of privacy in one's person, which in *Martin* we noted to be particularly high, one's expectation of privacy in the exterior of a vehicle is more modest. While many in our society have a great fondness for their vehicles, it is too great a leap of logic to conclude that the automobile is entitled to the same sanctity as a person's body. Furthermore, the exterior of a vehicle is exposed to the public, and is not considered an intimate space. Thus, considering the relatively minor privacy interest in the exterior of the vehicle and the minimal intrusion occasioned by a canine sniff, we conclude that mere reasonable suspicion, rather than probable cause, was required prior to Rosie sniffing the exterior of his vehicle. As Trooper Banovsky had reasonable suspicion prior to Rosie responding to the scene, *see supra*, then Rosie's sniff of the exterior of the vehicle passes constitutional muster.

 We next examine Appellant's claim that Rosie's sniff of the interior of the vehicle violated his constitutional rights. It is on this search that Appellant focuses. He contends that

debating the application of existing case law to the current matter. Thus, as we have not been provided with argument on the issue of whether the distinctions drawn by *Johnston* and *Martin* are well founded, it seems prudent to reserve judgment until we are presented with a case which fully fleshes out this important point.

14. As Rosie alerted in two distinct locations—and as Appellant's arguments are based on where Rosie was located at the time she alerted—we shall consider each of Rosie's alerts separately.

15. Appellant contends that Rosie did not alert to the presence of drugs when she was sniffing the exterior of the car, but rather first alerted only after she jumped through the window and was in the interior of the car. This is incorrect. Various police reports established that Rosie first alerted to the exterior of the driver's door as she was walking around the perimeter of the car. *See* Affidavit of Probable Cause, dated January 9, 1998; *see also* Trooper Banovsky's Incident Report.

he had a heightened expectation to privacy in the interior of the vehicle, particularly since it contained personal items. He argues that prior to Rosie sniffing the interior of the car, the police must first have had probable cause.

In support of this argument, Appellant relies on *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995), wherein we stated that police must have probable cause prior to conducting a warrantless search of a vehicle. Contrary to Appellant's supposition, *White* is not on all fours with the matter *sub judice*. In *White*, the interior of the car was searched by police officers. In contrast, at issue here is a canine sniff. While we have recognized that canine sniffs are searches, we have carefully articulated that they are not akin to searches conducted by human law enforcement officers and need not in all instances be supported by probable cause. *See Johnston, supra*. Thus, while *White* requires that a police officer have probable cause prior to entering and searching a car, it did not address the scenario of a dog sniff. Thus, it is not conclusive support for Appellant's position.

Even if we were to assume *arguendo* that there is some other support for Appellant's position that probable cause is needed before the police may conduct a canine sniff of the interior of the vehicle, Appellant would still not be entitled to relief. The police have probable cause "where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Commonwealth v. Gibson*, 536 Pa. 123, 638 A.2d 203, 206 (1994). In this matter, probable cause existed prior to Rosie jumping through the window of Appellant's vehicle. As discussed above, the police had reasonable suspicion before Rosie responded to the scene. After Rosie arrived, and while she was outside the automobile, she alerted to the driver's side door; this indicated to the officers that she had detected narcotics. At that juncture, "a person of reasonable caution [would believe] that an offense has been or is being committed[,]" *Gibson*, 638 A.2d at 206, and reasonable suspicion ripened into probable cause. Thus, even if we assume that probable cause was required prior to

Rosie sniffing the interior of the vehicle, there was no constitutional violation as probable cause existed at that point. Appellant's second claim for relief must therefore be denied.

For the foregoing reasons, the order of the Superior Court is affirmed.

Justice CASTILLE files a concurring opinion in which Justice EAKIN and BAER join.

Justice SAYLOR concurs in the result.

Justice NIGRO files a dissenting opinion.

## CONCURRING OPINION

Justice CASTILLE.

I join the Majority Opinion because it comports with both federal law and the existing state constitutional construct.[1] I write separately to address this Court's existing jurisprudence in the canine sniff area and to suggest what I believe is a better approach.

The Majority has the unenviable task of attempting to resolve the canine sniff question in light of a category-based approach to canine sniffs which has been adopted in *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987) and in this Court's subsequent decision in *Commonwealth v. Martin*, 534 Pa. 136, 626 A.2d 556 (1993). I believe this category-based construct is ill-suited to account for the subtleties that often arise and control questions in the search and seizure arena in

---

1. With respect to Trooper Banovsky's initial reasonable suspicion, I note that the crowning fact is the presence of the open boxes of detergent and fabric sheets. These items are not usually found in an open state in automobiles (or at least not unless those automobiles are bound to or from the laundry), and Trooper Banovsky knew from his experience that drug couriers commonly employ such agents in an attempt to mask the tell-tale odor of illegal narcotics. *See United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir.1998) ("we agree with the government's assertion that a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs") (collecting cases).

general, and canine sniffs in particular, and it produces per-plexing results. I suggest that we reconsider the construct.[2]

In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the U.S. Supreme Court noted that "the canine sniff is *sui generis,*" emphasizing that "[w]e are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.* at 707, 103 S.Ct. at 2644–45. The Court explained the basis for this conclusion as follows:

> A "canine sniff" by a well-trained narcotics detection dog … does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this inves-tigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and incon-venience entailed in less discriminate and more intrusive investigative methods.

*Id.,* 103 S.Ct. at 2644. The *Place* Court ultimately concluded that the conduct of police in subjecting a suspected drug courier's luggage, which was detained in a public airport, to a

2. The Majority suggests that we wait for a case where a party chal-lenges the *Johnston/Martin* construct before we reconsider it. I have no objection. I write to outline the problem because, faced with the precedent and the effect of *stare decisis,* the Commonwealth is unlikely to forward such a challenge before the Court, or some of its members, acknowledge the difficulty. Indeed, in the recent past, this pragmatic consideration has led this Court to correct problematic precedents even in the absence of a request from the parties. *See Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (Pa.2003 abrogating relaxed waiver rule on direct appeals); *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002) (overruling *Commonwealth v. Hubbard,* 372 A.2d 687 (1977)).

canine sniff by a trained drug detection dog was not a search within the meaning of the fourth amendment. *Id.,* 103 S.Ct. at 2645.[3]

The federal canine sniff cases have been uneven in the wake of *Place,* particularly where the dogs have entered vehicles. *See also* 1 W.R. LaFave, *Search and Seizure,* § 2.2(f) (3d Ed.1996 & Supp.2004) (outlining history and complexity of this issue). The uncertainty no doubt results from the fact that, notwithstanding that canine sniffs may be *sui generis* as a theoretical matter, they occur only in the context of certain and varying factual patterns. Thus, the fact that a canine sniff of luggage located in a public place might not be deemed a search in some situations does not mean that all situations involving canine sniffs would be or should be deemed so non-intrusive as not to trigger fourth amendment concerns. For example, it is unlikely in the extreme that the U.S. Supreme Court would approve of a random traffic stop conducted merely to permit a canine sniff of the vehicle. *See* LaFave, *supra,* § 2.2(f), at 456–57 ("It is extremely important to recognize that the *Place* holding does not validate the use of drug detection dogs in all circumstances.... [I]f an encounter between the dog and a person or object is achieved by bringing the dog into an area entitled to Fourth Amendment protection, that entry is itself a search subject to constitutional restrictions."). Thus, in *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), where drug-detection dogs were employed by police to sniff the exterior of stopped vehicles at a drug interdiction traffic checkpoint, relief was granted to the defendant because the fact that the use of

---

**3.** The *Place* Court's conclusion in this regard arguably was *dicta* because the Court ultimately held that the 90–minute detention of the luggage preceding the canine sniff was unreasonable under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Place,* 462 U.S. at 709–10, 103 S.Ct. at 2645–46. As Professor LaFave has noted, however, the question of whether the conclusion was *dicta* soon became academic for the Court has treated the resolution of the canine sniff issue as a binding holding. *See* 1 W.R. LaFave, *Search and Seizure,* § 2.2(f), at 453–54 & nn. 255, 257 (3d Ed.1996 & Supp.2004) (citing *United States v. Jacobsen,* 466 U.S. 109, 124, 104 S.Ct. 1652, 1662, 80 L.Ed.2d 85 (1984)). *See also City of Indianapolis v. Edmond,* 531 U.S. 32, 40, 121 S.Ct. 447, 453, 148 L.Ed.2d 333 (2000).

the dogs "[did] not transform the seizure into a search" did not change the fact that the antecedent suspicionless seizure, which was effected as part of a drug interdiction checkpoint program designed to uncover evidence of "ordinary criminal wrongdoing," ran afoul of the fourth amendment. *Id.* at 40, 42, 121 S.Ct. at 453, 454. So, too, in *Place* itself, relief was granted because the length of the detention of the luggage was deemed to be unreasonable, 462 U.S. at 709–10, 103 S.Ct. at 2645–46, even though the canine sniff which was accommodated by the detention was not grounds for relief.

Even though this Court has agreed that canine sniffs are less intrusive than conventional searches, the Court has forged its own direction jurisprudentially in the canine sniff arena, under authority of Article I, Section 8 of the Pennsylvania Constitution, and the Majority decides this case consistently with that analytical framework. This Court approached the canine sniff questions presented in *Johnston* and *Martin* as if in pursuit of some Platonic ideal, establishing what appear to be categorical rules drawing conceptual distinctions between canine sniffs of "places," *see Johnston*, 530 A.2d at 79 (requiring lawful police presence and only reasonable suspicion), and "people," *see Martin*, 626 A.2d at 560–61 (requiring lawful police presence and probable cause). This case involves the third of the generic nouns, *i.e.*, a thing (an "effect" for fourth amendment purposes; a "possession" for Article I, Section 8 purposes). Rote application of the *Johnston/Martin* categorical approach would make resolution of this appeal simple: an automobile is certainly not a person, it is more similar to a place; but it is not entitled to heightened scrutiny vis a vis other places or things (such as the home). Accordingly, all canine searches of automobiles should only need to be supported by reasonable suspicion. Ultimately, the Majority approves of the canine sniffs here based upon this existing categorical analysis.

The Majority is correct in looking to *Johnston* and *Martin* for guidance: they are the closest precedent; their continuing vitality has not been specifically challenged by the Commonwealth; and their proper application is the central dispute

between the parties. But, the complexities of this case cause me to query whether this category-based construct is appropriate in the first place. There may be canine sniffs of places or things—such as things in public view in public places—which should not have to be supported by any level of suspicion whatsoever. On the other hand, where, as in the case *sub judice*, the canine sniff is affected only after a seizure, the underlying seizure must comport with governing standards. Similarly, if the canine sniff requires entry into a constitutionally-protected area, traditional search and seizure doctrines beyond the law governing canine sniffs must be consulted and satisfied. In other words, in a case like this, the constitutional problem of the dog's **entry into the car** is not diminished by the fact that a canine sniff upon that entry is less intrusive than a human search of the interior would be. Indeed, the lack of intrusiveness of the canine sniffs in *Place* and *Edmond* did not cure the unreasonable detentions which allowed those unintrusive sniffs to occur. In my view, this case confirms the necessity for flexibility in this Court's approach to these cases and persuasively impeaches the categorical construct.

To understand the deficiencies in the categorical construct, a discussion of *Johnston* and *Martin* is required. In *Johnston*, a majority of this Court rejected the then-recent decision in *Place* as a matter of Pennsylvania constitutional law, preferring instead the fourth amendment views of the three justices who dissented in *Place*. *Johnston* involved a canine sniff of the corridor of a storage locker facility, conducted by police with the explicit permission of the owner of the facility. The sniff was not arbitrary or random, for police had observed conduct leading them to believe that bales of marijuana were being stored in one or more of the lockers in the facility. A majority of this Court held that, although such a consensual canine sniff was probably not even a search under the fourth amendment in light of *Place*, it nevertheless was a search for purposes of Article I, Section 8 of the Pennsylvania Constitution. The *Johnston* majority declared that such a limited "search" required: (1) reasonable suspicion to believe that drugs may be present in the place to be tested; and (2) that

police were lawfully present in the place where the canine sniff was conducted. The majority concluded that the canine sniff of the outside of the lockers in *Johnston* was lawful because its newly formulated two-part state constitutional test was satisfied. The majority dubbed its Article I, Section 8 approach a "Fourth Amendment middle ground" which preserved the utility of trained drug detection dogs but also ensured that such dogs were not employed "at random and without reason." 530 A.2d at 79. The majority emphasized that its holding was based in part upon the very considerations that had led the *Place* Court to conclude that a canine sniff was not a search at all:

> Our holding is based in part, on considerations not dissimilar to those stated in *United States v. Place:* a canine sniff-search is inherently less intrusive upon an individual's privacy than other searches such as wiretapping or rummaging through one's luggage; it is unlikely to intrude except marginally upon innocent persons; and an individual's interest in being free from police harassment, annoyance, inconvenience and humiliation is reasonably certain of protection if the police must have a reason before they may, in the circumstances of this case, utilize a narcotics detection dog.

530 A.2d at 79–80.

Where *Johnston* has come to be recognized as the Pennsylvania constitutional test of the lawfulness of canine searches of places, *Martin* has come to govern canine searches of the person. Martin was stopped by police while carrying a satchel which police had reasonable suspicion to believe contained drugs. Police directed Martin to place the satchel on the ground, whereupon a trained drug detection dog sniffed it and correctly indicated the presence of narcotics. 626 A.2d at 558–59. The *Martin* majority remarkably held (by 4–3 vote), again apparently under the aegis of the Pennsylvania Constitution, that probable cause was required before police could permit the canine to sniff the satchel. The majority distinguished *Johnston* as involving a canine sniff of the exterior of a place, whereas the majority treated the canine sniff of the exterior of Martin's satchel as a sniff of a person. Notwith-

standing the limited intrusion of canine sniffs as explicitly recognized in *Johnston*, the majority held that canine sniffs of persons require a higher level of suspicion because "an invasion of one's person is, in the usual case, [a] more severe intrusion on one's privacy than an invasion of one's property." *Id.* at 560. However, the majority never explained the basis for its assumption that a satchel should be deemed a part of a person, rather than a person's property, for purposes of this distinction—despite the fact that both dissenting opinions, as well as the concurrence of Mr. Justice (now Chief Justice) Cappy, directly joined that issue.[4] The majority went on to declare in *dicta*—and without analysis, explanation, or citation—that even if police have probable cause to search a person/satchel, and have conducted a confirmatory canine sniff, the person/satchel cannot actually be searched unless and until police then secure a search warrant. *Id.* at 560–61.[5]

**4.** The concurrence stressed that "it is the nature of the governmental intrusion on which we must focus," and emphasized that Martin was carrying the satchel "up until the point where the police approached with guns drawn and ordered that the satchel be placed upon the ground." 626 A.2d at 562 (Cappy, J., Concurring). In such an instance, the concurrence saw no reasoned distinction between the satchel and "a purse, a breast pocket wallet, or a coat." *Id.*

**5.** The *Martin* majority's suggestion of a search warrant requirement was *dicta* because the majority ultimately decided the case upon the ground that probable cause was lacking. *Id.* at 561. In any event, the search warrant *dicta* is contrary to settled law governing searches incident to arrest. No warrant is required to search a person incident to a lawful arrest. *See Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896, 902 (1995) (outlining contours of search incident to arrest under Pennsylvania Constitution). The scope of a search incident to a lawful arrest encompasses the person as well as the immediate area in which the person was detained. *Id.* If a satchel is considered a person for purposes of the level of suspicion required, then it must be considered a person for purposes of a search incident to arrest.

Of course, the *Martin* majority's holding that probable cause is required for a canine sniff of a person/satchel effectively eliminates the utility of canine sniffs, since police would have no reason to conduct a canine sniff if they already have probable cause to arrest. This is particularly so if a search warrant were deemed required for a post-canine sniff search incident to arrest, where one is not required if no canine sniff occurs. *See Martin*, 626 A.2d at 565 (Montemuro, J., dissenting). Such a result is incongruous, to say the least.

The final point worth noting about *Johnston* and *Martin* is that neither opinion cited anything in the text of the Pennsylvania Constitution, Pennsylvania constitutional history, policy concerns unique to Pennsylvania, or the persuasive experience of other jurisdictions which supported the categorical holdings that emerged. Of course, much water has passed under the Pennsylvania constitutional bridge since *Johnston* was decided; indeed, that case was decided some four years before *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), the seminal decision by Mr. Justice (now Chief Justice) Cappy, which first set forth an analytical framework to approach claims that Article I, Section 8 of the Pennsylvania Constitution should be deemed to afford greater protections than its fourth amendment counterpart.[6] It is more difficult to explain the absence of any substantive state constitutional analysis in *Martin*, however, since that case was decided well after *Edmunds*.[7]

The *Martin* majority defended its holding(s) with remarkable and unfortunate hyperbole, considering that a minimally intrusive canine sniff of a satchel, supported by reasonable suspicion, was at issue:

> We are mindful that government has a compelling interest in eliminating the flow of illegal drugs into our society, and we do not seek to frustrate the effort to rid society of this scourge. But all things are not permissible even in the pursuit of a compelling state interest. The Constitution does not cease to exist merely because the government's interest is compelling. A police state does not arise whenever crime gets out of hand.

*Id.* at 561. *Martin* is a severely flawed precedent which warrants reexamination.

6. In *Edmunds*, this Court stated that it is "essential" that a court undertaking an independent analysis of Article I, Section 8 consider "at least" four specific areas: the text of the Pennsylvania constitutional provision; the history of the provision, including Pennsylvania case law; related case law from other states; and policy considerations unique to Pennsylvania. *Id.* at 895.

7. I have expressed elsewhere my reservations about broad state constitutional holdings which are unaccompanied by anything remotely resembling a substantive *Edmunds* analysis. *See Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697, 714 n. 6 (2002) (Castille, J., joined by Newman, J., concurring); *Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295, 305 (2001) (Castille, J., joined by Saylor, J., dissenting). In a recent scholarly article, my learned colleague Mr. Justice Saylor described in some detail the various approaches to state constitutional interpretation in our federal system, emphasizing the complexity of the

The Majority's logical application of the existing *Johnston/Martin* categorical approach results in the following construct concerning the degree of suspicion required to justify a canine sniff under the Pennsylvania Constitution:

(1.) reasonable suspicion is required to justify the uniquely lesser intrusion of a canine sniff of the outside of a place, even if the owner of the common area where the sniff is conducted gives consent (*Johnston* holding);

(2.) probable cause is required to justify a canine sniff of a person (*Martin dicta*), even though a full-blown *Terry* search requires mere reasonable suspicion;

(3.) probable cause is required to justify a canine sniff of the outside of an object carried by a person (*e.g.*, a satchel), even if the dog does not go into the object itself (*Martin* holding);

(4.) reasonable suspicion is required to justify a canine sniff of the exterior of an automobile (today's holding, rendered in a case where the sniff occurred only after a lawful highway stop by police and during a lawful investigative detention); and

(5.) it is unclear whether reasonable suspicion or probable cause is required to justify a canine sniff of the interior of a vehicle, where the dog physically enters the car (today's second holding, rendered in the same circumstances as (4) above; for purposes of the decision, the Majority assumes, without deciding, that probable cause is required.).

This overall construct is impossible to square with the governing values of the fourth amendment and Article I, Section 8 and settled search and seizure jurisprudence in related areas. For example, what search and seizure value

inquiry when candidly and responsibly undertaken by courts. *See* Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged, Prophylactic Rule,* 59 N.Y.U. Ann. Surv. Am. L. 283, 285–94 & accompanying notes (2003). Justice Saylor's trenchant exploration reaffirms the necessity for an approach such as *Edmunds* and I am correspondingly wary of decisions which represent a view (or perhaps it was just a time), which did not perceive the complexity. That exploration also counsels that we tread carefully before following unexplained, categorical pronouncements that animate certain of this Court's precedents in this area.

dictates that a trained drug detection dog cannot so much as take a whiff of the outside of a suspect's satchel unless probable cause is present? No matter how sincere and tenacious its aspirations, a satchel is doomed never to become a person: A canine sniff of the outside of such an object is far less intrusive than a *Terry* frisk of a person, which only requires reasonable suspicion. A canine sniff is also less intrusive than the actual physical entry of a dog into a personal possession, whether it is luggage, a car, or a satchel. Moreover, a sniff of the outside of a mere possession, such as a satchel, is nowhere near as intrusive as the full-blown search of a person incident to arrest: To require probable cause in both instances is irrational.[8] Moreover, given the *Johnston* Court's recognition that a canine sniff is inherently less intrusive than other searches, what rational value is served by requiring reasonable suspicion before a consent sniff of the common area of a storage facility may be conducted? This Court's jurisprudence should attempt more carefully to account for the privacy values actually at stake in these instances, rather than dictating a series of procrustean categories into which we force ill-fitting search and seizure fact patterns like so many square pegs into round holes.

8. In his dissent in *Martin*, Mr. Justice Montemuro articulated why it was difficult to see a constitutionally significant distinction between the canine sniff of the locker in *Johnston* and the sniff of Martin's satchel:

Here, the police, while conducting a brief investigatory stop, directed a drug detection dog to sniff a satchel that was placed on the ground. The present search, like the one in *Johnston*, implicated privacy interests protected by our constitution in an inherently less intrusive manner than a traditional search. The sniff search only provided police with the limited information of whether contraband was present, and therefore was unlikely to intrude, except marginally, upon an innocent person's rights. The additional inconvenience of a brief sniff search conducted during a valid investigatory stop was minimal. Further, the subject of the investigation was reasonably protected from police harassment, annoyance and humiliation since both the investigatory stop and the canine sniff were supported by reasonable suspicion. Thus, the limited intrusion in the present case was not qualitatively different from the sniff search permitted in *Johnston*.

626 A.2d at 564 (Montemuro, J., dissenting). In my view, this logic is unimpeachable.

The Majority's reasoning is a facially logical application of *Johnston* and *Martin*, and in this case, causes no harm since probable cause supported the most intrusive act of the dog entering the vehicle. But it seems to me that the category-based approach adopted in *Johnston* and *Martin*, which finds no source in Pennsylvania constitutional law or history, is itself illogical. To properly decide these cases, it is not necessary to articulate a conceptual, Platonic ideal concerning canine sniffs of automobiles versus sniffs of persons, places, or things. A canine sniff of the exterior of a parked car in a public parking lot triggers different constitutional concerns than a sniff of the exterior of a car which has been lawfully stopped and detained by police precisely to permit the sniff.

I believe that this Court ultimately should return to a traditional totality of the circumstances approach in these cases, unencumbered by the artificial construct of *Johnston* and *Martin*. Under our traditional approach, the canine sniff of the outside of appellant's vehicle only had to be supported by reasonable suspicion because police did not just happen upon appellant's car in a parking lot and subject it to the procedure; rather, appellant was lawfully stopped on the highway for speeding. Stops of the person always require, at a minimum, reasonable suspicion. After reasonable suspicion of a drug offense arose, Trooper Banovsky then continued to detain appellant precisely to secure the presence of the canine and its handler, so as to conduct the sniff of the vehicle exterior. Thus, it is not the Platonic conception of the nature of a canine sniff that dictates the outcome, but the circumstances (here, of undisputed seizure) which surrounded it. Indeed, the closer question might be that which was ultimately determinative in the defendant's favor in *Place: i.e.*, whether the length of time (over 70 minutes) during which appellant was detained on a highway, in snowy January weather, was so unreasonable as to run afoul of *Terry*, irrespective of the canine sniff question.[9] But, that question is not before us. Although appellant adverts to the length of time he was

9. Although this detention was shorter than the 90 minute detention of the luggage in *Place*, appellant was more isolated and had no option but to remain.

detained, he does not argue here, nor did he argue below, that the length of the detention preceding the canine sniff was unlawful under *Place*.[10]

Turning to the second canine sniff—Rosie's jumping into the car and sniffing the interior—there is no illegality again, not because of the nature of the canine sniff, but because, by the time this occurred, Rosie had already positively alerted to the presence of narcotics while outside the driver's side door. This fact, which confirmed Trooper Banovsky's existing reasonable suspicion of a drug offense, gave rise to probable cause. *See United States v. Sukiz–Grado*, 22 F.3d 1006, 1009 (10th Cir.1994) (probable cause existed for entry of trained canine where dog alerted to presence of drugs when conducting canine sniff of exterior of vehicle). Under Pennsylvania's version of the automobile exception to the search warrant requirement, given the mobility of the vehicle and the spontaneous arising of probable cause, police would have been justified in conducting an immediate search of the interior of the car. *See Perry, supra* (Castille, J., concurring) (discussing Pennsylvania law concerning automobile exception to warrant requirement). Since the police themselves could have searched the car at this point, Rosie's entry into the car, and her confirmatory alert following a minimally intrusive sniff, was not unlawful.

In my view, the calculus would alter significantly if police had released Rosie into the car solely upon reasonable suspicion, notwithstanding that canine sniffs are less intrusive than full-blown searches. *See Almeida–Sanchez v. United States*, 413 U.S. 266, 269–70, 93 S.Ct. 2535, 2537–38, 37 L.Ed.2d 596 (1973) ("the *Carroll* doctrine [*Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), which established the first exception to the warrant requirement for automobile searches] does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be

**10.** The record, including appellant's omnibus pre-trial motion to suppress, his memorandum of law and reply memorandum, and his argument before the suppression court, reveals that he did not challenge the canine sniff on grounds that the length or conditions of the detention were unreasonable for a *Terry* stop.

probable cause for the search.").[11] But that is not what happened here.

I note that the Superior Court avoided the question of whether probable cause was required and whether it existed for the canine sniff of the interior of the vehicle by emphasizing that Rosie leapt through the window without prompting from her handler. *Commonwealth v. Rogers,* 741 A.2d 813, 820 (Pa.Super.1999) (citing *United States v. Stone,* 866 F.2d 359 (10th Cir.1989)). I would be loathe to approve the second canine sniff on such ephemeral grounds, and the Majority is wise not to do so. Although the desire to enter the vehicle may have struck Rosie spontaneously and instinctively, a leashed and properly restrained police canine cannot effect such an entry without, at a minimum, some acquiescence from its handler. Approving the entry of the dog upon grounds of spontaneity would be akin to approving a dog "spontaneously" tearing open a package or luggage during a canine sniff. The extent of the intrusion is different in kind from the *sui generis* exterior sniff which was deemed so minimal by the *Place* Court and by this Court in *Johnston;* alleged "canine spontaneity" can hardly justify the heightened intrusion.[12]

Justice EAKIN and BAER join this concurring opinion.

### DISSENTING OPINION

Justice NIGRO.

As I fully agree with Appellant that the suppression court properly determined that Trooper Banovsky did not have

---

**11.** Although this Court may recognize enhanced protections against unlawful searches and seizures under the Pennsylvania Constitution, we cannot dilute a suspects fourth amendment rights.

**12.** Notably, in finding that the canine sniff in *Edmond* did not transform the traffic checkpoint seizure into a search, the Supreme Court emphasized that there was no entry into the car:

Just as in *Place,* an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. [*Place,* 462 U.S. at 707, 103 S.Ct. at 2644.] Like the dog sniff in *Place,* a sniff by a dog that simply walks around a car is "much less intrusive than a typical search." *Ibid.*

531 U.S. at 40, 121 S.Ct. at 453.

reasonable suspicion to detain Appellant or to conduct a canine search of his vehicle, I respectfully dissent.

In support of its conclusion that the police were justified in detaining Appellant beyond the traffic stop here, the majority cites to the fact that Appellant appeared nervous, the fact that Appellant provided out-of-order documents as well as a vague answer to Trooper Banovsky, and the fact that Appellant had laundry supplies in the back seat of his car. According to the majority, these factors, when viewed together, add up to support a finding that Trooper Banovsky had reasonable suspicion that Appellant was carrying drugs in his car. I not only believe that this holding is legally unsound, but find such a holding completely troubling, as it essentially stands for the proposition that an individual can legitimately be detained in this Commonwealth simply on the basis that he appears nervous and happens to be carrying laundry products in his car.

In my view, these factors are completely innocuous and could just as easily be explained by legitimate activity. In the first instance, it is more than clear that laundry supplies are not contraband and have legitimate uses. The majority, however, turns the innocent activity of carrying laundry supplies into a criminally suspicious one by pointing to Trooper Banovksy's observation that laundry supplies *can* be used to mask the odor of marijuana. Unlike the majority, I simply do not believe that such an open-ended assertion, which could apply to any number of odor-masking products, lends support to a finding of reasonable suspicion here. *See United States v. Villa–Chaparro,* 115 F.3d 797, 802 (10th Cir.1997) (scent of a masking agent alone is insufficient to establish reasonable suspicion).[1] I realize, of course, that, while the majority cites

---

1. While the presence of masking agents may be a factor to consider in making a determination of whether reasonable suspicion exists, such agents must be analyzed in context, considering the nature of the items, its potential uses, and whether, in light of its nature and use, the location where it is found is unusual. *See People v. Cervantes–Arredondo,* 17 P.3d 141 (Colo.2001). For example, in *Villa–Chaparro,* detergent crystals were scattered around the interior of a pickup truck. 115 F.3d at 802. While there may be an innocent reason for having detergent

to the laundry products as the "most important" factor in finding the instant detention valid, *see* Op. at 1190, it does not rely on that factor alone. Instead, the majority places great emphasis, as the Superior Court did, on the fact that Appellant was also "extremely agitated." I do not believe, however, that the additional fact that Appellant was nervous gives rise to a finding of reasonable suspicion, especially in light of the fact that it is not at all uncommon for a driver to be nervous when stopped by the police. *See United States v. Chavez–Valenzuela*, 268 F.3d 719, 726 (9th Cir.2001) (as "encounters with police officers are necessarily stressful for law-abiders and criminals alike," even extreme nervousness during traffic stop does not support a reasonable suspicion of criminal activity); *United States v. Salzano*, 158 F.3d 1107 (10th Cir. 1998) (it is common for most people to exhibit signs of nervousness when confronted by police whether or not the person has engaged in criminal activity). Indeed, Appellant's nervousness here could just have easily been explained by the fact that he had just been stopped by the police for speeding. Thus, I simply cannot agree with the majority's conclusion that a nervous driver, who happens to be carrying laundry products and out-of-order paperwork, is properly subject to an investigative detention.

The majority recognizes that the factors it cites to do not clearly indicate criminal conduct but tries to deflate that fact's significance with its statement that even a combination of innocent factors, when taken together, may justify an investigative detention. While that may be true in limited circumstances, I simply cannot agree that the innocuous factors here, even when viewed as a whole, support a finding of reasonable suspicion any more than they would if looked at separately. Rather, in the end, Trooper Banovsky at best had a mere hunch that Appellant was carrying drugs in his car, which of course, is insufficient to establish reasonable suspicion under the jurisprudence of this Commonwealth. *See Commonwealth*

scattered around a vehicle, it is certainly more suspicious than driving a vehicle with a box of laundry detergent in the backseat, as anyone going to the laundromat must do, and as was the case here.

*v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177 (1992) (police officer's intuition does not constitute reasonable grounds to suspect criminal activity); *Commonwealth v. Phinn*, 761 A.2d 176 (Pa.Super.2000) (trooper did not have reasonable suspicion of criminal activity when trooper observed plastic air freshener on dashboard of car during traffic stop and saw driver make furtive movements).

As I do not believe that Trooper Banovsky had reasonable suspicion to detain Appellant beyond the traffic stop, I obviously also do not believe that the trooper had a sufficient basis to conduct a dog sniff of Appellant's car. I dissent.