COMMONWEALTH of Pennsylvania, Appellant,

v.

Romel TUCKER, Appellee.

Superior Court of Pennsylvania.

Submitted May 9, 2005.

Filed Sept. 6, 2005.

---

Hugh J. Burns, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Andrew G. Gay, Philadelphia, for appellee.

Before: TODD, PANELLA, and POPOVICH, JJ.

OPINION BY PANELLA, J.:

¶ 1 The Commonwealth appeals from the order entered on April 28, 2004, by the Honorable Joseph A. Dych, Court of Common Pleas of Philadelphia County, which granted the suppression motion of Appellee, Romel Tucker.[1] After careful review, we reverse.

¶ 2 On December 21, 2003, at approximately 11:00 a.m., Officer George Burgess of the Philadelphia Police Department was conducting surveillance[2] of the 800 block of East Madison Street[3] in the City of Philadelphia. The surveillance operation had its genesis in "[n]umerous roll call complaints of drug activity on that block and around that area." N.T., 4/28/04, at 3.

¶ 3 At approximately 11:15 a.m., Officer Burgess observed a man and woman, later identified as Allan Jordan and Minnie Brown, approach the front door of the residence at 804 East Madison Street. Shortly thereafter, Officer Burgess watched as Jordan knocked on the front door of the residence. Tucker soon opened the door. Thereafter, Officer Burgess observed the individuals engage in a "brief conversation" during which Jordan reached into his pocket, retrieved cash, and started to count it. Id., at 4. Immediately thereafter, Jordan and Brown entered the residence, but exited a mere "twenty seconds" later. Id. During that short time, Officer Burgess did not have an opportunity to observe the parties.

¶ 4 When Jordan and Brown exited the residence, Jordan reached into his pocket, after which, he dropped a "pink packet" on the ground which Jordan then picked up and handed to Brown. Id. Jordan and Brown then walked eastbound on Madison Street. Officer Burgess radioed a description of Jordan and Brown to his backup

1. This appeal is permissible as the Commonwealth has certified in good faith that the suppression order submitted for our review substantially handicaps the prosecution and the appeal is not intended for delay purposes. *See* Pa.R.App.P., Rule 311(d), 42 PA.CONS. STAT.ANN.; *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

2. Officer Burgess testified that he has conducted "[w]ell over a thousand" narcotics surveillance operations during his career and has made "[h]undreds of narcotics arrests." N.T., 4/28/04, at 11.

3. Officer Burgess testified that the 800 block of East Madison Street is a "high crime area" in which you can "get any type of drug you want." N.T., 4/28/04, at 12.

officers and requested that the two be stopped. A short while later, as Jordan and Brown were just leaving the 800 block of East Madison Street, Tucker stuck his head out of the front door of the residence at 804 East Madison Street, "looked east," and then went back into the residence. *Id.*, at 5. Thereafter, the backup officers stopped Jordan and Brown and recovered one pink packet containing crack cocaine from Brown and four pink packets containing crack cocaine from Jordan. The backup officers immediately informed Burgess of the recovery of the cocaine from Jordan and Brown.

¶ 5 Subsequent thereto, at approximately 11:58 a.m., Tucker exited the residence, along with a child. Officer Burgess radioed a description of Tucker to his backup officers and requested that he be stopped. Tucker fled when he was approached by the officers. After a short foot pursuit, which ended in a scuffle, Tucker was apprehended and the police recovered a fully-loaded .45 caliber Colt handgun, one clear package of marijuana, $664.00 in cash, and a set of keys.

¶ 6 Officer Burgess then directed the officers back to the residence at 804 East Madison Street where they encountered Ayanna Williams, who lived in the residence. Williams gave the officers her signed consent to search the residence. Following a search of the residence police recovered bullets for a .45 caliber handgun, bullets for a 9 mm handgun, a silencer, packing material, razor blades, and 18 pink-tinted packets containing crack cocaine. The pink packets "appeared to be

identical" to the baggies recovered from Jordan and Brown. *Id.*, at 11.

¶ 7 Tucker was subsequently arrested and charged with possession with intent to deliver a controlled substance,[4] possession of a controlled substance,[5] receiving stolen property,[6] and three counts of violations of the Uniform Firearms Act.[7] Thereafter, on March 26, 2004, Tucker filed an omnibus pre-trial motion in which he sought, *inter alia*, the suppression of the contraband seized from his person as well as from the residence at 804 Madison Street.[8]

¶ 8 A hearing on Tucker's suppression motion was held by the court on April 28, 2004. The sole witness who testified at the hearing was Officer Burgess. Immediately following the hearing, the suppression court entered an order granting Tucker's suppression motion. This timely appeal followed.

¶ 9 On appeal, the Commonwealth raises the following issues:

I. Under the totality of the circumstances, was probable cause present to arrest defendant, where an experienced officer watched him conduct what appeared to be a drug sale out of a house in a known drug area, and the buyers were immediately thereafter stopped and crack recovered from them; even assuming probable cause was not present, did such circumstances at a minimum give rise to reasonable suspicion, which then ripened into probable cause when defendant suspiciously surveyed the

---

**4.** 35 PA.STAT. § 780–113(a)(30).

**5.** 35 PA.STAT. § 780–113(a)(16).

**6.** 18 PA.CONS.STAT.ANN. § 3925.

**7.** 18 PA.CONS.STAT.ANN. §§ 6105, 6106, and 6108.

**8.** In his suppression motion, Tucker alleged that the contraband was seized in violation of the Fourth Amendment of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution.

street and fled from an approaching police car?

\* \* \*

II. Was the house out of which defendant conducted his drug sale properly searched, where the police independently obtained the written consent of a resident to search the premises, and the record is devoid of any evidence showing that defendant had an expectation of privacy in the house, a fact which he had the burden of proof?

\* \* \*

Commonwealth's Brief, at 4.

¶ 10 Our standard of review when the Commonwealth appeals from a suppression order is well-settled. As an appellate court reviewing the ruling of a suppression court,

we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. We must first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom. The suppression court's factual findings are binding on us and we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Rosas,* 875 A.2d 341, 346 (Pa.Super.2005) (internal quotation marks and citations omitted).

¶ 11 With this standard in mind, we must first determine whether the suppression court's findings of fact are traceable to evidence in the record. Our review of the record with respect to the suppression court's factual findings reveals that all of the suppression court's findings of fact are traceable to testimony in the record except one: the suppression court found that "no conversation [between Tucker, Jordan, and Minnie] ever occurred in the officers [sic] observance." Suppression Court Opinion, 8/19/04, at 4. This finding has no support in the record. Officer Burgess testified that Tucker "had a brief conversation with both Ms. Brown and Jordan." N.T., 4/28/04, at 4. The suppression court found his testimony credible. *See id.,* at 1. Accordingly, we may reject the suppression court's finding in this regard. *See Commonwealth v. Cottman,* 764 A.2d 595, 597 (Pa.Super.2000) ("[W]here the factual findings made by the suppression court are not supported by the evidence of record, we may reject those findings.").

¶ 12 We must next focus our attention to the propriety of the suppression court's legal conclusions. The suppression court concluded that the police officers lacked reasonable suspicion of Tucker's involvement in criminal activity and, therefore, the seizure of Tucker was illegal and the evidence of contraband must be suppressed. *See* Suppression Court Opinion, 8/19/2004, at 4. The suppression court also concluded that "[s]ince the investigative detention of the defendant was not supported by reasonable suspicion and was, therefore, unconstitutional, the contraband recovered from 804 Madison must be suppressed as 'fruit of the poisonous tree.'" *Id.,* at 4.

¶ 13 As mentioned, the Commonwealth, in its first issue presented on appeal, argues that the suppression court's finding that the officers lacked reasonable suspicion of Tucker's involvement in criminal activity is erroneous.

¶ 14 In the landmark criminal case, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that police may stop and

frisk a person where they have reasonable suspicion that criminal activity is afoot. *See also, Commonwealth v. Blair,* 860 A.2d 567, 573 (Pa.Super.2004) ("[A] police officer may, short of an arrest, conduct an investigative detention if he has a reasonable suspicion, based upon specific and articulable facts, that criminality is afoot."). *Terry* sets the standard for reasonableness under both the Fourth Amendment of the United States Constitution and under Article I, § 8 of the Pennsylvania Constitution. *See Commonwealth v. Wiley,* 858 A.2d 1191, 1194 (Pa.Super.2004).

¶ 15 The central question into whether a stop is reasonable is an objective one and centers on whether "the facts available to the officer at the moment of the [intrusion] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Blair,* 860 A.2d at 573 (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868) (brackets in original). In making this inquiry, the totality of the circumstances must be considered. *See id.* In addition, "we must give 'due weight . . . to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience.'" *Commonwealth v. Rogers,* 578 Pa. 127, 134, 849 A.2d 1185, 1189 (2004) (quoting *Commonwealth v. Cook,* 558 Pa. 50, 57, 735 A.2d 673, 676 (1999)) (brackets in original). Of course, the inquiry into the establishment of reasonable suspicion requires a lesser showing in terms of quantity, content, and reliability than that which would be needed to establish probable cause. *See Blair,* 860 A.2d at 573.

¶ 16 In the present case, Officer Burgess, an eight year veteran of the police department and a four year veteran of the narcotics division, who has conducted well over a thousand narcotics surveillance operations, testified that he was conducting surveillance on the 800 block of East Madison Street as he had received numerous complaints of drug dealing on the block. As mentioned, Officer Burgess characterized the block as a "high crime area" in which you can "get any type of drug you want." N.T., 4/28/04, at 12. In addition, Officer Burgess testified that he watched while two people approached the front door of a residence, at which time he observed one of the individuals take cash out of his pocket, and converse with Tucker. Shortly thereafter, the two individuals went into the residence and left the residence a mere twenty seconds later. Upon exiting the residence, one of the individuals dropped a pink-tinted packet.

¶ 17 Based on these observations and his experience as an officer in the narcotics division, Officer Burgess testified that he believed a narcotics transaction had occurred. As such, he radioed his backup officers so that they could apprehend the two individuals and, upon apprehending the suspects the police recovered crack cocaine.

¶ 18 Not long after the two individuals had left the residence, Officer Burgess observed Tucker looking out the front door in the direction that the two individuals had departed and then went back into the property. Thereafter, Officer Burgess watched as Tucker left the premises with a small child and, when approached by police officers, Tucker took off running.

¶ 19 Based on the foregoing, the suppression court's conclusion that the police lacked reasonable suspicion to stop Tucker is simply untenable. In the present case, there was ample evidence that criminal activity was afoot. In addition to Officer Burgess's initial observation of Tucker and the two individuals, which is recounted above, the fact that Tucker was in a high crime area and fled when approached by the police provided the officers with rea-

sonable suspicion to stop Tucker and conduct a *Terry* stop. *See Commonwealth v. Jefferson*, 853 A.2d 404 (Pa.Super.2004) (holding that a police officer's observation of an individual in a high crime area, coupled with that individual's prompt flight upon observing the officer, combine to establish reasonable suspicion that criminal activity is afoot, thereby permitting a *Terry* stop). *See also, Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (finding that while mere presence in a high crime area is insufficient to support a *Terry* stop, the additional factor of unprovoked flight was indeed relevant and that the two factors in combination were sufficient to satisfy the *Terry* standard of reasonable suspicion). Accordingly, we find that the police had reasonable suspicion to stop Tucker.

¶ 20 In its second issue, the Commonwealth argues that the suppression court erred in concluding that the contraband recovered from the residence at 804 Madison Street must be suppressed as "fruit of the poisonous tree." It is well-established that for Tucker to prevail on the suppression claim with respect to the contraband recovered from the residence he had to establish a privacy interest in the area searched or effects seized. Our Supreme Court explained this principle in *Commonwealth v. Hawkins*, 553 Pa. 76, 718 A.2d 265 (1998), wherein it stated that:

> [i]n order to prevail on a [suppression] motion, … **a defendant is required to separately demonstrate** a personal privacy interest in the area searched or effects seized, and that such interest was 'actual, societally sanctioned as reasonable, and justifiable.' Such a legitimate expectation of privacy is absent where an owner or possessor meaningfully abdicates his control, ownership or possessory interest.

*Id.*, 553 Pa. at 81, 718 A.2d at 267 (emphasis and brackets added). *See also, Commonwealth v. Witman*, 750 A.2d 327, 334 (Pa.Super.2000), *appeal denied*, 564 Pa. 138, 764 A.2d 1053 (2000), *cert. denied*, 534 U.S. 815, 122 S.Ct. 42, 151 L.Ed.2d 15 (2001) ("[T]o prove a legitimate expectation of privacy in a structure, a defendant must establish that he has either a possessory interest or a legitimate presence, or he must establish some factor from which a reasonable and justified expectation of privacy can be deduced.") (citations omitted).

¶ 21 Tucker, however, made no attempt to establish his privacy interest in the area searched or effects seized from the 804 Madison Street residence. Accordingly, the trial court erred in suppressing the contraband seized from the residence. *See, e.g., Commonwealth v. Peterson*, 535 Pa. 492, 501, 636 A.2d 615, 619 (1993) (holding that appellant was not entitled to suppression of evidence seized from premises where "[h]e has made no averment of possessory interest, legitimate presence, or indeed any factor from which a reasonable and justifiable expectation of privacy could be deduced").

¶ 22 Order reversed. Case remanded for trial. Jurisdiction relinquished.