J-A07009-16, J-A07010-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN GANT AND JEREMIAH DARYLE GANT | |
| Appellant | No. 596 WDA 2015 |

Appeal from the Order Entered March 10, 2015
In the Court of Common Pleas of Somerset County
Criminal Division at No(s): CP-56-CR-0000020-2014
CP-56-CR-0000021-2014

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN GANT, | |
| Appellant | |

_____

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | |
| Appellee | |
| v. | |
| JEREMIAH DARYLE GRANT | |
| Appellant | |
| | No. 603 WDA 2015 |

Appeal from the Order Entered March 10, 2015
In the Court of Common Pleas of Somerset County
Criminal Division at No(s): CP-56-CR-0000020-2014
CP-56-CR-0000021-2014

BEFORE: BOWES, J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.: **FILED JULY 22, 2016**

The Commonwealth appeals at 596 WDA 2015 from an order suppressing evidence seized from a vehicle pursuant to a search warrant following a videotaped traffic stop on the Pennsylvania Turnpike on October 21, 2013. For the following reasons, we affirm.[1]

On October 21, 2013, John and Jeremiah Gant were charged with possession with intent to deliver a controlled substance, possession of a controlled substance, criminal conspiracy and providing false identification to a law enforcement officer.[2] Each defendant filed a motion to suppress, and on December 10, 2014, the trial court held a hearing on the motions. On March 10, 2015, the court entered a memorandum and order granting the motions to suppress. The Commonwealth filed a timely notice of appeal,

_____

[1] Appellees, Jeremiah and John Gant, filed a cross-appeal at 603 WDA 2016 in which they raised various grounds for upholding the suppression order. Only aggrieved parties are entitled to appeal. Pa.R.A.P. 501. The Gants are not aggrieved parties because the trial court granted their motion to suppress. ***Commonwealth v. Dellisanti***, 831 A.2d 1159, 1163 n.7 (Pa.Super.2003), ***reversed on other grounds***, 876 A.2d 366 (Pa.2005) ("one is not an aggrieved party when one prevails …"). Accordingly, we will quash the Gants' cross-appeal. ***Id***. (quashing Commonwealth's appeal because it prevailed in proceedings below).

[2] 35 P.S. § 780-113(a)(30) & (16), 18 Pa.C.S. §§ 903, 4914, respectively.

and both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

The Commonwealth raises the following issues in its appeal:

1. Whether the lower court erred in finding that the officer in this matter did not possess the requisite reasonable suspicion to justify an investigative detention of the [Gants]?

2. Whether the lower court erred in not finding that the officer in this matter had reasonable suspicion to conduct a canine search of the [Gants'] vehicle?

Brief For Commonwealth, at 4.

When reviewing an order granting a motion to suppress,

we are required to determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate. In conducting our review, we may only examine the evidence introduced by appellee along with any evidence introduced by the Commonwealth which remains uncontradicted. Our scope of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them. Our scope of review over the suppression court's legal conclusions, however, is plenary.

***Commonwealth v. Henry***, 943 A.2d 967, 969 (Pa.Super.2008). In addition, "this court may uphold the decision of a lower court if it can be sustained for any reason, even if the reasons given by the lower court to support its decision are erroneous." ***In Re Estate of Klink***, 743 A.2d 482, 485 (Pa.Super.1999).

The trial court made the following findings of fact:

On or about October 21, 2013, [the Gants] were traveling eastbound on the Pennsylvania Turnpike in a tan colored Chevrolet Cruze bearing Georgia Vehicle Registration: PPY1252.

- 3 -

At approximately 9:15 a.m., Pennsylvania State Police Trooper John P. Isoldi (hereinafter, the 'Trooper' or 'Trooper Isoldi') departed the Pennsylvania State Police Barracks and entered onto the Pennsylvania Turnpike at or near milepost 114. Soon after entering onto the Pennsylvania Turnpike, the Trooper began following [the Gants]. After following the vehicle for approximately one-half of a mile, the Trooper was able to ascertain the vehicle's speed by utilizing his speedometer. Upon determining that the vehicle was traveling 71 miles per hour on a freeway where there was a posted 65 miles-per-hour speed limit, a violation of 75 Pa.C.S. § 3362, the Trooper effectuated a traffic stop near milepost 118. Trooper Isoldi approached the vehicle from the passenger's side, away from traffic, and requested information from [the Gants]. Defendant Jeremiah Gant, the driver, provided to the Trooper a Maryland driver's license and paperwork which documented ownership of the vehicle and proof of insurance. The Trooper was soon able to determine that Jeremiah Gant's driver's license was in fact suspended,[2] and the vehicle was registered to and owned by a third party, Connie Gant. Defendant John Gant, the lone passenger, provided to the Trooper the false name of 'Byron Warren,' with a date of birth of '9/24/1964.' Trooper Isoldi attempted a search for the name 'Byron Warren,' which yielded no results. Trooper Isoldi then requested that Jeremiah Gant exit the vehicle, at which time the Trooper escorted him to the front of the patrol car, directly in front of the patrol car's mobile video recording unit (hereinafter, the 'MVR'). The Trooper handed Jeremiah Gant a written warning for the traffic violation, returned his information, and advised him that he was free to leave the scene.[3] Before Jeremiah Gant could enter the vehicle to depart the scene, Trooper Isoldi once again made contact with him. In fact, Jeremiah Gant was unable to take more than three steps and had not yet reached the rear of the vehicle before the Trooper re-engaged him for further questioning. The Trooper asked Jeremiah Gant if he knew the name of the passenger, to which Jeremiah Gant responded that he 'just call[s] him Uncle Bry.' The Trooper then asked for consent to search the vehicle for identification belonging to the passenger, as well as suspected contraband. Jeremiah Gant denied consent to search the vehicle. After being denied consent, Trooper Isoldi called for a canine unit to come to the scene for assistance.

> [2] The Trooper was, at some point, able to determine that Jeremiah Gant had prior drug convictions. Exactly when

- 4 -

the Trooper was able to ascertain this information is not clear from the record.

[3]Although the Trooper advised Jeremiah Gant that he was free to leave, the Trooper testified at the suppression hearing that [the Gants] were never actually free to leave the scene because neither of [the Gants] had a valid driver's license. In fact, the Trooper testified that he advised Jeremiah Gant that he was free to leave because 'case law dictates that I have to advise the operator[] [he is] free to leave and [he has] to feel free to leave prior to me again contacting that individual to ask for consent to search the vehicle.' …

Soon after the Trooper called for assistance, Trooper Mike Volk arrived at the scene, followed by Canine Trooper Brett Kahler (hereinafter, 'Trooper Kahler' or 'Kahler') and his canine, Kubko (hereinafter, 'Kubko' or the 'Canine'). Upon his arrival, Trooper Kahler approached the vehicle from the passenger side and placed his head inside the vehicle via the open passenger's side window. It appears that Trooper Kahler visually inspected the interior of the vehicle, with his head remaining inside the vehicle for approximately four seconds. Trooper Kahler then retrieved Kubko and proceeded to walk to the front of the vehicle, where the pair waited for approximately twenty seconds before beginning the exterior sniff search. To begin the sniff search, Trooper Kahler and Kubko quickly jogged around the exterior of the vehicle, ending their initial run-around at the front of the vehicle. Kahler and Kubko then began a slower walk around the vehicle, during which Trooper Kahler pointed to various locations on the vehicle. The Canine appeared to sniff at or near every location Trooper Kahler pointed towards. After approximately twelve seconds of searching, Trooper Kahler and Kubko reached the passenger side of the vehicle, directly in line with the open window. After a few quick sniffs, Kubko jumped onto the side of the vehicle, and placed his paws on the door and his head through the open window. With his head inside the vehicle, it appears that Kubko sniffed the interior of the vehicle for a few seconds. For the next twenty seconds, Kubko continued to jump onto the vehicle and place his head and paws inside the vehicle. It was at this point that Kubko pulled his front paws off of the vehicle and sat on his haunches. Kubko remained in a seated position for approximately three seconds, during which time Trooper Kahler made several motions with his right arm. Then,

without any discernable warning, Kubko launched himself through the open window and into the vehicle. Trooper Kahler immediately released Kubko's leash and allowed him to run throughout the vehicle. The Canine remained inside for approximately one minute before Kahler was able to coax him out of the vehicle. At this point, according to his testimony, Trooper Isoldi believed that the canine sniff search had ended.

As a result of the canine sniff search, [the Gants] and the vehicle were detained and transported to the Pennsylvania State Police Turnpike Barracks, Somerset. Trooper Isoldi applied for a search warrant in order to search the vehicle for identification and narcotics, and said warrant was granted. A search of the vehicle revealed numerous controlled substances in varying quantities.

Memorandum, at 2-4 (footnotes omitted).

Multiple additional details deserve mention.[3] First, Trooper Isoldi, the only witness at the suppression hearing, testified that both men in the car were "breathing heavily [and] shaking." N.T., 12/10/14, at 13. When Trooper Isoldi asked the passenger in the car for identification, he claimed that "he … lost his ID somewhere in Ohio over the weekend." *Id*. The trooper testified that the passenger gave his name as Byron Warren with a birth date of September 24, 1964, all the while "hesitating and stumbling over his words. Appeared to me he was guessing." *Id*. Later, after Trooper Isoldi summoned the canine unit, but before the unit arrived, the passenger admitted that "he was in fact lying about his name. He was concerned he

_____

[3] We may take these details into account because the Gants did not introduce any contradictory evidence on these points. *Henry*, 943 A.2d at 969.

may or may not have had a warrant. And he advised me that he had had previous violations of the Drug Device and Cosmetic Act." *Id*. at 15.

Second, we find significant the videotape of the traffic stop that the trial court admitted into evidence during the suppression hearing. The videotape did not have an audio soundtrack, so it did not record what anyone said during the traffic stop. The videotape showed Kubko circling the vehicle with his handler, Trooper Kahler, while sniffing the exterior. On the passenger side of the vehicle, Kubko twice stood up on his hind legs and pushed his head inside the car interior, all while Trooper Kahler appeared to make encouraging gestures. Kubko then sat down on his haunches in an "alert" position. Moments later, as Trooper Kahler continued to gesture, Kubko jumped through an open passenger side window into the vehicle and circled the passenger compartment.[4]

Third, while Trooper Isoldi is not trained as a canine officer, he testified that he "helps and assists with the training of canines." N.T., 12/10/14, at 18. He has worked with canine officers in hundreds of narcotics cases, and he has made over 350 arrests in undercover and highway interdiction cases. *Id*. at 18-19. Trooper Isoldi testified that through his years of experience, he understands when a dog alerts to drugs:

---

[4] Trooper Kahler did not testify at the suppression hearing.

"They'll sit down, they'll stare, they go on point, which means they stop … just like a bird dog when you're pheasant hunting." *Id*. at 20.

Fourth, Trooper Isoldi's search warrant application did not mention that Kubko placed his head in the interior of the vehicle during the canine sniff and jumped into the vehicle at his handler's direction. All that Trooper Isoldi averred with regard to the canine sniff was: "Trooper … [Kahler], PSP Canine Drug Detection Handler[,] conducted an exterior search of the vehicle and related to me that his K-9 dog Kubko indicated positively to an odor of a controlled substance coming from the interior of the vehicle." Suppression Hearing, Commonwealth Exhibit A (search warrant and affidavit of probable cause).

At the conclusion of the suppression hearing, the trial court ordered the parties to brief their respective positions. The Gants' opening memorandum argued, *inter alia*, that the search warrant was defective because Kubko sniffed the interior of the vehicle before alerting. The Commonwealth ignored this point in its response. The Commonwealth simply characterized Kubko's search as an "exterior canine sniff" and asserted: "[T]he video clearly shows [Trooper] Kahler and Kubko going around the vehicle and the dog alerting at the right front passenger's side of the vehicle by sitting down and refusing to move." Commonwealth's Brief In Opposition To Defendants' Omnibus Motion To Suppress, at 8-9.

The trial court concluded that Trooper Isoldi lacked reasonable suspicion to detain the Gants further after issuing Jeremiah Gant a traffic warning. We conclude that suppression was proper, but for different reasons. *See In Re Estate of Strahsmeier*, 54 A.3d 359, 364 n.17 (Pa.Super.2012) (Superior Court may affirm for any reason and is not constrained to affirm on grounds relied upon by trial court).

We agree with the Commonwealth's first argument on appeal that Trooper Isoldi had reasonable suspicion to detain the Gants for further investigation after issuing Jeremiah Gant a traffic warning. We have defined "reasonable suspicion" as follows:

> [T]he officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot … In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight … to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Smith*, 917 A.2d 848, 852 (Pa.Super.2007) (citations omitted). Reasonable suspicion is less demanding than probable cause, which is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Johnson*, 42 A.3d 1017, 1031 (Pa.2012).

During a traffic stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." ***Berkemer v. McCarthy***, 468 U.S. 420, 439 (1984). "[I]f there is a legitimate stop for a traffic violation … additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions." ***Commonwealth v. Chase***, 960 A.2d 108, 115 n.5 (Pa.2008).

Trooper Isoldi stopped the Gants' vehicle on the Pennsylvania Turnpike for a valid reason: the Gants' vehicle was speeding. While processing the speeding violation, Trooper Isoldi observed several details which indicated that criminal activity was afoot. Both vehicle occupants were breathing heavily and shaking. Jeremiah Gant gave Trooper Isoldi a suspended Maryland driver's license. The car was registered to a Georgia resident who had the same last name (Gant) but who was not in the car. Jeremiah Gant told Trooper Isoldi that he did not know the passenger's name and simply called him "Uncle Bry". The passenger in turn claimed that he lost his identification "somewhere in Ohio." He identified himself as "Byron Warren" with a birth date of September 24, 1964 but displayed so much uncertainty that Trooper Isoldi believed that he was guessing. A computer search for Byron Warren yielded no results. These factors provided reasonable suspicion to detain the Gants and continue an investigation into possible

criminal wrongdoing. *See, e.g., **Commonwealth v. Jones***, 874 A.2d 108, 117 (Pa.Super.2005) (totality of circumstances, including defendant's nervousness and stalling, group's prior inconsistent statements, unverifiable information on defendant's identification card, and police officer's experience and drug interdiction training, furnished reasonable suspicion of criminal activity and justified investigative detention following routine traffic stop). Indeed, these factors entitled Trooper Isoldi to continue detaining the Gants even after telling Jeremiah Gant that he was free to leave. ***Commonwealth v. Kemp***, 961 A.2d 1247, 1262 (Pa.Super.2008) (facts gathered during valid traffic stop may be utilized to justify investigatory detention occurring after police officer has indicated that defendant is free to leave).

We turn to the Commonwealth's second argument on appeal: "The trial court erred in not finding that Trooper Isoldi had reasonable suspicion to conduct a canine search." We agree that Trooper Isoldi had reasonable suspicion to conduct a canine sniff of the vehicle's exterior, but we reach a different conclusion with regard to Kubko's sniffs of the vehicle's interior.

The use of trained dogs to sniff for the presence of drugs constitutes a search under Article I, section 8 of the Pennsylvania Constitution. ***Commonwealth v. Johnston***, 530 A.2d 74, 78 (Pa.1987). Before conducting a canine sniff of a person, the police must have probable cause to believe that the sniff will produce contraband or evidence of crime. ***Commonwealth v. Martin***, 626 A.2d 556, 560 (Pa.1993). Conversely,

police officers only need reasonable suspicion to conduct a canine sniff of a place, such as the exterior of a vehicle. ***Commonwealth v. Rogers***, 849 A.2d 1185, 1191 (Pa.2004).

Here, Trooper Isoldi had reasonable suspicion to conduct an exterior sniff. As discussed above, at the time the trooper issued the traffic warning, he had reasonable suspicion that criminal wrongdoing was afoot. Moreover, after the traffic warning, but before the canine sniff began, John Gant admitted to the trooper that he had a record of drug-related violations, and that there might be a warrant for his arrest. Collectively, these facts are analogous to the evidence that furnished reasonable suspicion for an exterior canine sniff in ***Rogers***. ***Id.***, 849 A.2d at 1191 (officer had reasonable suspicion to conduct canine sniff of vehicle exterior for drugs, where trooper lawfully stopped vehicle for traffic violations, defendant was in extreme state of nervousness, paperwork for vehicle was incomplete and conflicting, defendant acknowledged that address on paperwork was fictitious, trooper observed open boxes of laundry detergent and fabric softener sheets in vehicle along with packaging tape, and trooper knew from his experience in investigating narcotics offenses that those laundry supplies were commonly packaged with certain drugs to mask their odor so as to avoid detection during transport).

We turn to the more difficult question of whether Kubko's interior sniffs were constitutional. While circling the vehicle, Kubko stood up on his

hind legs two times and sniffed the interior of the vehicle through open windows, all while Trooper Kahler appeared to make encouraging gestures. Only *after* these sniffs did Kubko alert and then jump into the vehicle. Was reasonable suspicion or probable cause necessary for Kubko's interior sniffs?

**Rogers**, the only Pennsylvania appellate decision we can find on the subject of interior canine sniffs, came close to answering this question but ultimately stopped short. The canine in **Rogers**, like Kubko here, jumped into the vehicle's interior during a canine sniff. The defendant argued that probable cause did not exist for a canine sniff of the interior. Our Supreme Court observed that while canine sniffs are searches, "they are not akin to searches conducted by human law enforcement officers and need not in all instances be supported by probable cause." *Id*. at 1192. The Court continued that "assum[ing] *arguendo*" that probable cause was necessary for an interior sniff, the evidence supported probable cause because "the police had reasonable suspicion before Rosie responded to the scene," and "after [the dog] arrived, … while she was outside the automobile, she alerted to the driver's side door[,] [indicating] to the officers that she had detected narcotics." *Id*. Thus, "reasonable suspicion of contraband in the vehicle ripen[ed] into probable cause." *Id*.

In a concurring opinion, Justice Castille, joined by two other justices, said the following:

> Turning to the [interior] sniff—Rosie [the canine]'s jumping into the car and sniffing the interior—there is no illegality again, not

- 13 -

because of the nature of the canine sniff, but because, by the time this occurred, Rosie had already positively alerted to the presence of narcotics while outside the driver's side door. This fact, which confirmed Trooper Banovsky's existing reasonable suspicion of a drug offense, gave rise to probable cause. *See* ***United States v. Sukiz–Grado****,* 22 F.3d 1006, 1009 (10th Cir.1994) (probable cause existed for entry of trained canine where dog alerted to presence of drugs when conducting canine sniff of exterior of vehicle). Under Pennsylvania's version of the automobile exception to the search warrant requirement, given the mobility of the vehicle and the spontaneous arising of probable cause, police would have been justified in conducting an immediate search of the interior of the car … Since the police themselves could have searched the car at this point, Rosie's entry into the car, and her confirmatory alert following a minimally intrusive sniff, was not unlawful.

*In my view, the calculus would alter significantly if police had released Rosie into the car solely upon reasonable suspicion, notwithstanding that canine sniffs are less intrusive than full-blown searches*. ***See Almeida–Sanchez v. United States****,* 413 U.S. 266, 269–70, 93 S.Ct. 2535, 2537–38, 37 L.Ed.2d 596 (1973) ('the ***Carroll*** doctrine [***Carroll v. United States****,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), which established the first exception to the warrant requirement for automobile searches] does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search.'). But that is not what happened here.

***Id***. at 1199 (emphasis added).

Although ***Rogers*** cautions that probable cause is not a prerequisite for every interior canine sniff, we conclude that, at least in this case, probable cause was necessary for Kubko's interior sniffs. Human police officers clearly must have probable cause to search motor vehicle interiors without a warrant. ***Commonwealth v. Gary***, 91 A.3d 102, 124, 138 (Pa.2014). It would dramatically erode this rule and circumvent the probable cause

requirement if canines could sniff vehicle interiors on the basis of reasonable suspicion.

For several reasons, we conclude that the Commonwealth failed to demonstrate probable cause for Kubko's interior sniffs. To begin with, the Commonwealth waived its right to argue that probable cause existed for Kubko's interior sniffs. The Gants argued in the trial court that probable cause was necessary for the interior sniffs, Gants' Joint Brief In Support Of Omnibus Pretrial Motion, at 13-14. Not only did the Commonwealth ignore this argument in its response, but it ignored clear evidence that Kubko sniffed the vehicle interior twice before alerting. Instead, the Commonwealth asserted misleadingly that Kubko performed an exterior sniff and then alerted. Commonwealth's Brief In Opposition To Defendants' Omnibus Motion To Suppress, at 8-9. By disregarding the Gants' probable cause argument below, the Commonwealth cannot claim probable cause here.[5] Pa.R.A.P. 302(a) ("issues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Even if the Commonwealth had preserved the right to argue probable cause, it would not have prevailed on this issue. We have held above that at the time Kubko began his exterior sniff, there was reasonable suspicion to

_____

[5] Compounding this waiver is the Commonwealth's failure to argue probable cause in its appellate brief. Its argument about Kubko's search is one-half page long with boilerplate citations about the reasonable suspicion doctrine. Brief For Commonwealth, at 13.

believe that criminal activity was afoot. But this did not rise to the level of probable cause to search for drugs; there simply was not enough evidence for a reasonable person to believe that drugs were in the vehicle. Whereas probable cause arose in **Rogers** because the canine alerted during an exterior sniff, Kubko alerted only after sniffing the vehicle interior. Kubko's pre-alert interior sniffs thus tainted its alert, its leap into the car, and its sniff around the passenger compartment.

Conceivably, the Commonwealth might have helped its cause by presenting the canine handler, Trooper Kahler, as a witness during the suppression hearing. Assuming that Trooper Kahler qualified as an expert in canine handling, he might have been able to testify that Kubko did not obtain any useful information during his pre-alert interior sniffs and alerted solely on the basis of sniffing the exterior. But Trooper Kahler did not testify, so there is nothing to rebut the inference arising from the videotape that Kubko alerted on the basis of the improper interior sniffs.[6]

The absence of probable cause for Kubko's pre-alert interior sniffs vitiated Trooper Isoldi's search warrant. He would not have obtained a search warrant without alleging in his affidavit of probable cause that

---

[6] Furthermore, it does not appear that Kubko decided on its own initiative to stand on its hind legs and sniff the interior. Instead, it appears that Kubko did this because of Trooper Kahler's encouraging gestures. Once again, Trooper Kahler's absence from the suppression hearing seems to have harmed the Commonwealth's case, for he might have given a different explanation for Kubko's actions.

"Trooper [Kahler] … conducted an exterior search of the vehicle and related to me that his K-9 dog Kubko indicated positively to an odor of a controlled substance coming from the interior of the vehicle."  It is clear, however, that Kubko's alert was the product of interior, rather than exterior, sniffs. Because of this material defect in the warrant, we must affirm the trial court's order granting the Gants' motion to suppress.

Order affirmed; case remanded for further proceedings consistent with this memorandum; jurisdiction relinquished.

Judge Bowes joins in the memorandum.

Judge Mundy concurs in the result.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/22/2016</u>