J-A15002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DAMON JOHNSON, | |
| Appellant | No. 3007 EDA 2017 |

Appeal from the Judgment of Sentence Entered August 11, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0003364-2016
CP-51-CR-0010937-2016
CP-51-CR-0013500-2009

BEFORE:  BENDER, P.J.E., GANTMAN, P.J.E., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED AUGUST 23, 2019**

Appellant, Damon Johnson, appeals from the judgment of sentence of an aggregate term of 6-12 years' incarceration, to be followed by 4 years' probation, imposed after the trial court found him guilty at a non-jury trial of resisting arrest, carrying a firearm without a license, carrying a firearm on the streets of Philadelphia, person not to possess a firearm, simple assault, recklessly endangering another person (REAP), and criminal mischief.[1] Appellant challenges the sufficiency of the evidence supporting his conviction and the trial court's denying his motion to suppress the seized evidence.  After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 5104, 6106, 6108, 6105, 2701, 2705, 3304, respectively.

The trial court summarized the facts adduced at trial as follows:

On January 28, 2016 at approximately 9:00 pm, Police Officer Paul Sulock and his partner, Police Officer Jeffrey Stauffer, were traveling northbound on Frankford Avenue, approaching Cambria, when they heard two gunshots north of their location. Officer Sulock continued northbound on Frankford Avenue toward the gunshots. Upon his arrival, within 30 seconds of hearing the gunshots, Officer Sulock observed a large crowd of people running in different directions while screaming. Officer Sulock was then flagged down by a female who told him "they are shooting out here," to which he inquired as to the identity of the shooter. The female replied that she did not know and that she had only heard the shots.

Within two minutes after speaking with the female, Officer Sulock drove eastbound on the 1900 block of Stella Street where he observed a light blue 2001 Grand Marquis traveling at a high rate of speed. The car was leaving Frankford Avenue, the area of the shooting, and heading westbound on Stella Street. The 1900 block of Stella Street is approximately one block away from the scene of the shooting at 2900 Frankford Avenue. While Officer Sulock was driving eastbound, [Appellant] was driving westbound. However, Officer Sulock was able to record the license plate number and observed [Appellant] driving the car. Officer Sulock immediately made a U-turn and followed [Appellant]'s vehicle. After [Appellant] noticed he was being followed, he abruptly parked in front of 1945 or 1947 Stella Street, in a handicap parking space, on the north side of the street. Once parked, [Appellant] immediately left the vehicle, ran, and attempted to enter 1947 Stella Street. Officer Sulock stepped out of his vehicle to investigate [Appellant]'s behavior.

As Officer Sulock approached [Appellant], [Appellant] bladed his body away from Officer Sulock, turning the left side of his body, while keeping his left hand in his waistband area. Officer Sulock asked [Appellant] what he was doing and requested to see [his] hands. [Appellant] responded by repeatedly claiming, "I live here." However, Officer Sulock knew [Appellant]'s claim to be false as Officer Sulock was familiar with the area and knew the actual occupant of this residence to be an elderly Caucasian man. Further, Officer Sulock had never seen [Appellant] in the area of the home. During the conversation, [Appellant] stepped over a handicap ramp at 1947 Stella Street and continued to inch his way

- 2 -

eastbound. Officer Sulock asked, again, to see [Appellant]'s hands and [he] complied. Officer Sulock then placed [Appellant], with his hands up, against a wall.

After [Appellant] was against the wall, Officer Sulock proceeded to ask him for the location of the keys to the vehicle and inquired further as to his behavior. [Appellant] responded to the questions by stating, "I was never in no vehicle. I don't know what you're talking about." Officer Sulock noticed that [Appellant] was extremely nervous and smelled of gunshot powder. Officer Sulock then placed [Appellant] in the back of his police car for further investigation and retrieved the registration to the vehicle, which was hanging out of [Appellant]'s hoodie['s] pocket. While [Appellant] was in the police car, Officer Sulock walked to [Appellant]'s vehicle and noticed the vehicle was open. Officer Sulock began looking around the car with his flashlight. Officer Sulock found car keys on the driver's side floorboard and a spent shell casing on the floorboard in the back, behind the driver's seat.

As Officer Sulock was looking around inside of the vehicle, he heard glass shatter. Officer Sulock looked toward his police car and observed his partner place both of his hands up in front of his face and both of [Appellant]'s feet leaping out of the back of the police car. After exiting the vehicle, [Appellant] began fleeing on foot, eastbound on Stella Street, then northbound on Braddock, and then westbound on Toronto. Officer Sulock placed a call over police radio to other officers in the area and immediately gave chase on foot. Officer Sulock was able to get [Appellant] on the ground, while [Appellant] was heading westbound on Toronto. Officer Sulock required the assistance of five or six other officers in order to handcuff [Appellant]'s hands behind his back and control him due to [his] resistance.

After [Appellant] was under control, Officer Sulock sprinted back to [Appellant]'s vehicle and observed other officers around the car and noted the car doors were open and the trunk of the car was open. Officer Sulock then observed two handguns, a gold .45 caliber firearm and a black High Point .9 mm handgun, in the trunk of the vehicle. After observing the two firearms, Officer Sulock contacted East Detectives and [Appellant] was arrested and transported to East Detectives while [Appellant]'s vehicle was held at the scene. At a later date, it was discovered that [Appellant] was not licensed to carry or possess a firearm.

Also, on January 28, 2016, at around 9:00 pm, Detective Dennis Dusak was involved in an investigation of shots fired at 2957 Frankford Avenue. The scene was located near 2900 Frankford Avenue and Orleans Street. During his investigation, he observed a bullet hole in the front window of a residence at 2957 Frankford Avenue and spoke with the occupants of the residence, a mother and her 10-year-old child. Detective Dusak entered the residence and saw the bullet hole from inside the residence and noted there was also a bullet hole on the wall and on the other side of a kitchen cabinet. Detective Dusak also discovered a bullet projectile inside of the kitchen cabinet and submitted it to the Firearms Identification Unit. On a later date, Detective Dusak submitted two spent casings, discovered in front of 2033 East Orleans Street, on the highway, for a ballistic comparison with the bullet projectile he found at 2957 Frankford Avenue. The two locations where the casings and the bullet projectile were found were approximately one block away from each other. The casings were later identified as casings from a .45 and a .9 mm firearm.

Once [Appellant] was arrested, Detective Randall Farward recovered: two .45 caliber fired cartridge casings (FCCs) at 2033 East Orleans Street, two firearms from [Appellant]'s vehicle on Stella Street, a High Point .9 mm and a Model Star .45 caliber, one .9 mm shell casing from the rear driver's seat of [Appellant]'s vehicle, [Appellant]'s DNA, and [his] clothing to submit to the chemical laboratory to have ballistic activity testing performed. During testing of [Appellant]'s clothing, gunshot residue was discovered on the front, right side of [his] hooded sweatshirt, left sleeve and cuff, and inside of the hooded sweatshirt's pocket.

The firearms recovered from [Appellant]'s vehicle were submitted for DNA testing. The results were inconclusive. However, the testing revealed that the .45 caliber firearm contained DNA from two individuals, at least one of wh[om] was a male. Police Officer Gregory Walsh, a firearms examiner, test fired both firearms found in [Appellant]'s vehicle and found both to be operable. Officer Walsh also tested the three FCCs and projectile recovered. Officer Walsh concluded that the .45 caliber FCCs recovered from 2033 East Orleans Street, the shooting scene, were fired from the .45 caliber firearm recovered from [Appellant]'s trunk and the .9 mm FCC found in [Appellant]'s vehicle was fired from the .9 Trim firearm found in [Appellant]'s trunk.

[Appellant] testified at trial that he did not have a gun in his possession and that he did not know how the firearms got inside

the trunk of his vehicle on January 28, 2016. He further testified that he had no idea how the gun[]powder residue had gotten on his hooded sweatshirt the evening the incident occurred. [Appellant] testified that he believed he was arrested around 8:50 pm, shortly after leaving his house for his night classes. [Appellant] also testified that he normally attended night classes from 4 pm until 10 pm on a daily basis.

[Appellant] testified that he owned four vehicles, which he would lend to his friends and family, and that on the evening of January 28, 2016, he had woken up late for school. [Appellant] testified to the [c]ourt that[,] on that date[,] he hopped into the vehicle outside of his house since it was already started. Then, he corrected himself and stated that he went outside and put the keys in the ignition of the vehicle since it had an automatic starter…. He then proceeded to drive down to the intersection of Emerald and Stella and noticed police officers at the intersection. [Appellant] continued driving onto the 1900 block of Stella Street to pick up his model for school. [Appellant] claimed that his model was Mr. John, a man who lives at a house with a handicap parking space in front of it. [Appellant] then parked in the handicap space because it was already dug out after it had snowed.

[Appellant] claimed that the police officers were still at the intersection and watched him as he exited the vehicle and proceeded to 1947 Stella Street. [Appellant] knocked on the door to see if Mr. John wanted to come to [Appellant]'s school to model or if he wanted to reschedule. As [Appellant] was walking down the handicap ramp from Mr. John's house, he noticed the police officers without headlights on and without any lights. As [Appellant] walked down the ramp, he saw the two police officers with their guns pointed at him and he put his hands in the air. [Appellant] then claimed that the police officers handcuffed him and told him he was handcuffed for an investigation. The police officers had [Appellant] sit in the snow for a second and when [Appellant] stood back up, his pants fell down to his ankles. [Appellant] asked if one of the police officers would help him pull his pants back up but the officer refused.

[Appellant] testified that he was placed in the back of the police car with his pants still down at his ankles. He explained that since he was handcuffed and his pants were down, he had to enter the vehicle by leaning back and jumping backwards in the seat. He then claimed that once the officer slammed the door[,] the window shattered. [Appellant] explained that he didn't drive the vehicle

in question often, as it was usually loaned to friends and family. He stated that he only drove it on the day of the incident because of the snow. He stated that the car was already parked at his house when he left for school, but then he stated that it was dropped off to him by one of his brothers. [Appellant] claimed that he did not know where the key to the vehicle was, but was able to get a spare key from his house, even though he did not drive the car often. This [c]ourt found [Appellant]'s testimony to be entirely incredible due to the contradictory and illogical nature of [his] testimony.

Trial Court Opinion (TCO), 6/6/18, at 1-7.

The Commonwealth charged Appellant with resisting arrest at CP-51-CR-0003364-2016, and with the remaining, above-listed offenses at CP-51-CR-0010937-2016.[2] Appellant filed a motion to suppress the seized physical evidence, which the trial court denied following a hearing on April 11, 2017. Appellant's non-jury trial was held on May 24, 2017, where he was convicted of the offenses as stated above. On August 11, 2017, the trial court sentenced Appellant to 5-10 years' incarceration for person not to possess a firearm, a concurrent 1-2 years' incarceration for resisting arrest, and a consecutive term of 1-2 years' incarceration for carrying a firearm without a license. The court imposed 4 years' probation consecutive to Appellant's incarceration for carrying a firearm on the streets of Philadelphia, and concurrent terms of

_____

[2] At CP-51-CR-0013500-2009, the trial court determined that Appellant had violated his probation due to his new convictions at CP-51-CR-0003364-2016 and CP-51-CR-0010937-2016, and imposed a term of 6-12 months' incarceration. However, Appellant does not raise any issues in the present appeal that pertain to that matter.

probation of 2 years' each for simple assault and REAP. Appellant filed a timely post-sentence motion, which the court denied on October 4, 2017.

Appellant filed a *pro se* notice of appeal on September 5, 2017, which this Court docketed as 3007 EDA 2017.[3] Appellant was subsequently appointed appellate counsel, who filed a second notice of appeal on November 3, 2017, and which this Court docketed at 3610 EDA 2017. On May 2, 2018, Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement. Appellant petitioned to file a supplemental Rule 1925(b) statement, and with permission of the trial court, Appellant filed a supplemental Rule 1925(b) statement on May 14, 2018. The trial court issued its Rule 1925(a) opinion on June 6, 2018. On August 7, 2018, the suppression court filed an additional opinion per the trial court's request. On October 15, 2018, this Court dismissed the appeal docketed at 3610 EDA 2017 as duplicative.

Appellant now presents the following questions for our review:

> A. Did the trial court err when it found that there was sufficient evidence to prove, beyond a reasonable doubt, that [A]ppellant … was guilty of the criminal offenses of: simple assault…, [REAP]…, resisting arrest…, persons not to possess firearms…, firearms not to be carried without a

---

[3] Appellant filed a single notice of appeal with multiple lower court docket numbers. Our Supreme Court made it clear in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), that appellants are required to file separate notices of appeal at each docket number implicated by an order resolving issues that involve more than one trial court docket, regardless of whether a single hearing or order addressed the issues at all implicated dockets. However, as the instant appeal predates **Walker**, and the Court indicated that **Walker** applies prospectively, we do not quash this appeal.

license …[,] and carrying firearms on public streets or public property in Philadelphia…?

B. Did the trial court err when it denied Appellant's Motion to Suppress Physical Evidence, pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, as on January 28, 2016, the Philadelphia Police did not have reasonable suspicion nor probable cause to stop Appellant…, search him and seize his clothing nor to search his Grand Marquis automobile and seize two firearms from the trunk of this automobile?

Appellant's Brief at 2.

In the first question presented for our review, Appellant raises six distinct sufficiency issues. In the "Argument" section of his brief, Appellant discusses five of the six issues in a single section, without any subheadings to distinguish them. *See id.* at 32-40.

The Rules of Appellate Procedure clearly dictate that:

The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part-- in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a).

Appellant has failed to comply with Rule 2119(a). However, we decline to find waiver in this instance, as we are able to ascertain the nature of Appellant's sufficiency claims.

Our standard of review of sufficiency claims is well-settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the

verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

### *Firearm offenses*

Appellant argues that:

The only evidence adduced at trial with regard to the [firearm offenses] is that [Appellant] constructively possessed two firearms - a .9 millimeter handgun and a .45 caliber handgun, that were found in the trunk of his automobile. None of the Commonwealth's witnesses actually saw [Appellant] in possession of these firearms - *i.e.*, they were not on his person. There was, however, testimony at trial that other persons had access to [Appellant's] automobile.

Appellant's Brief at 37-38. Thus, Appellant challenges only the sufficiency of the evidence supporting his *possession* of the seized firearms, an element common to each of the firearm offenses. As Appellant acknowledges, even though he "was not in physical possession of the contraband, the Commonwealth" could "establish that he had constructive possession of the seized items to support his convictions." *Commonwealth v. Kinard*, 95 A.3d 279, 292 (Pa. Super. 2014).

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control. To aid

application, we have held that constructive possession may be established by the totality of the circumstances.

*Id.* (cleaned up).

Appellant is not entitled to relief. The only testimony that other persons had access to his vehicle was his own, and the trial court determined that Appellant was not credible "because there were conflicting facts in his testimony and much of the testimony did not makes sense." TCO at 8. Furthermore, Appellant simply fails to acknowledge the circumstantial evidence supporting his constructive possession of the seized firearms; police observed him fleeing from the scene of the shooting, and gunshot residue was ultimately discovered on his clothing. It was reasonable, therefore, for the trial court to conclude that Appellant had used one of the firearms discovered in the trunk of his vehicle during the shooting. Thus, it was sufficiently demonstrated that Appellant had both the power to control the weapons and the intent to exercise that control. For these reasons, we conclude that Appellant has failed to show that the evidence was insufficient to support that he constructively possessed the firearms; thus, the evidence was sufficient to support his convictions for carrying a firearm without a license, carrying a firearm on the streets of Philadelphia, and person not to possess a firearm.

### *Simple Assault and REAP*

Next, Appellant asserts that the evidence was insufficient to support his conviction for simple assault and REAP. In this regard, Appellant contends that:

The only evidence adduced at trial with regard to the criminal offenses of [s]imple [a]ssault … and [REAP] … is circumstantial, mostly ballistic and forensic in nature, relating to a shooting that occurred prior to [Appellant's] being arrested. None of the Commonwealth's witnesses actually saw [Appellant] shooting at or into a residence located at 2957 Frankford Avenue or anywhere else in that area. After a careful reading of the trial testimony, it is clear that this circumstantial evidence is insufficient to prove these criminal offenses beyond a reasonable doubt.

Appellant's Brief at 33.

Thus, Appellant does not appear to challenge any specifically enumerated element of the crimes of simple assault or REAP, nor does he dispute that a shooting occurred. Instead, he only contests the sufficiency of the evidence supporting his identity as the shooter, an implicit element of every crime. However, it is axiomatic that the "Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Hutchinson**, 947 A.2d 800, 806 (Pa. Super. 2008). Furthermore, "[f]light does indicate consciousness of guilt, and a trial court may consider this as evidence, along with other proof, from which guilt may be inferred." **Commonwealth v. Hargrave**, 745 A.2d 20, 23 (Pa. Super. 2000) (cleaned up).

The trial court found:

In this case, the … court considered [Appellant]'s flight as a factor along with the other evidence. Here, [Appellant] was observed driving his car at a high rate of speed, shortly after the gunshots were heard. [Appellant] exhibited evasive measures when he parked in a handicap space and went up to the house and falsely claimed he lived there. Once apprehended by police officers in the police vehicle, [Appellant] used force to break the glass and

flee while Officer Sulock was searching [Appellant]'s vehicle. In order to re-apprehend and restrain [Appellant], Officer Sulock required the assistance of an additional five or six police officers.

Police officers found two firearms in the trunk of [Appellant]'s vehicle. One of the firearms found in [his] vehicle was matched to the ballistics from the bullet found in the house located at 2957 Frankford Avenue and the two FCCs found on 2033 East Orleans Street matched the .45 caliber firearm recovered from the trunk of [his] vehicle. Gunpowder residue was later found, through the use of chemical testing, on [Appellant]'s hooded sweatshirt worn the night of the shooting and [Appellant] smelled strongly of gunpowder [on] the night of the incident.

These facts, although circumstantial, are more than sufficient evidence to support the simple assault and [REAP] convictions beyond a reasonable doubt. The [c]ourt concluded all of this circumstantial evidence[,] the recovery of the firearms from [Appellant]'s vehicle, ballistics evidence, evasive behavior, flight, and the incredible testimony of [Appellant], left no reasonable doubt that [he] was one of the shooters. Therefore, the circumstantial evidence taken as a whole, supports the conviction on the charges of simple assault and REAP.

TCO at 9-10.

We agree with the trial court. The evidence was more than sufficient to convict Appellant of simple assault and REAP.

### *Resisting Arrest*

In Appellant's statement of the questions presented, he challenges the sufficiency of the evidence supporting his conviction for resisting arrest. However, nowhere in the Argument section of his brief does he develop that claim. Accordingly, we deem this issue waived. *See In re Est. of Whitley*, 50 A.3d 203, 209–10 (Pa. Super. 2012) (cleaned up) ("The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities. This Court

will not consider the merits of an argument which fails to cite relevant case or statutory authority. Failure to cite relevant legal authority constitutes waiver of the claim on appeal.").

### *Suppression*

Appellant next argues that the trial court should have granted his motion to suppress the seized physical evidence.[4]

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where … the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. McAdoo***, 46 A.3d 781, 783–84 (Pa. Super. 2012) (cleaned up).

> Valid citizen/police interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty: the investigative

---

[4] Appellant sought suppression of the two firearms discovered in the trunk of his vehicle, as well at his clothing, which, when tested, revealed the presence of gunshot residue.

detention or **Terry**[5] stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; … whereas, a custodial detention is legal only if based on probable cause.

**Commonwealth v. Strickler**, 757 A.2d 884, 889 (Pa. 2000) (cleaned up, footnotes omitted). Probable cause "exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed."

**Commonwealth v. Evans**, 685 A.2d 535, 537 (Pa. 1996) (cleaned up).

Here, Appellant contends that Officer Sulock 1) lacked reasonable suspicion to frisk him for weapons; 2) lacked reasonable suspicion to place Appellant in the back of his patrol vehicle after failing to discover a weapon during the frisk; 3) lacked probable cause to search his vehicle; and 4) lacked probable cause to seize and then search his clothing for gunshot residue.

The suppression court determined that the initial frisk was justified based on the following facts:

After hearing gunfire, the police herein returned to Frankford Avenue and Orleans Street, a high crime area, one which they had just left ten minutes prior thereto after investigating a disturbance, and upon doing so, the police learned that some men had been firing guns there. The police then began patrolling in the area and a couple of minutes later, a couple of blocks from Frankford Avenue and Orleans Street, they saw a vehicle turning

_____

5 **See Terry v. Ohio**, 392 U.S. 1 (1968).

off of Frankford Avenue at a high rate of speed in a direction away from the site of the shooting. They made a U-turn and followed the vehicle, which was being driven by Appellant who, of his own volition, pulled his car over to the curb without signaling and stopped in a handicapped parking spot. Appellant then exited the vehicle and proceeded up to a residence.

Officer Sulock asked Appellant what he was doing and Appellant, who appeared to be very nervous and was standing sideways to the officer with his hands hidden from the officer's view, said he lived at the residence. Appellant then began walking away from the officer after repeating that he lived at the residence. Officer Sulock stopped Appellant from leaving.

At the moment the officer stopped Appellant, the officer had the legal right to do so to investigate if he had anything to do with the recent gun fire. As noted above, the officer observed Appellant driving at a high rate of speed away from the site where guns had been fired just minutes before. Appellant, who was visibly nervous, then refused to show his hands to the officer and tried to leave the area despite having told the officer that he lived in the residence he just walked up to after exiting the car. The totality of the circumstances, including Appellant's nervousness, refusal to show his hands, his attempt to leave, and the high rate [of speed] and direction that Appellant was driving combined to give the police the right to investigate Appellant as he attempted to walk away from the officers for possible involvement in the shooting at Frankford and Orleans. Reasonable suspicion does not require certainty that crime is afoot. In **Commonwealth v. Rogers**, 578 Pa. 127, 849 A.2d 1185 (2004), the Supreme Court stated:

> Of course, one can conceive of innocent explanations for each one of these facts. Yet, as noted *supra*, reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further. […] Rather, the test is what it purports to be—it requires a suspicion of criminal conduct that is reasonably based upon the facts of the matter. The facts of the matter *sub judice* give rise to just such a suspicion. [The a]ppellant was unusually agitated; the paperwork for his vehicle was out of order in several key respects; his answers regarding the location he had just departed were vague; and, most importantly, the backseat of his car contained products that Trooper Banovsky knew, via his extensive professional

- 15 -

experience, are commonly used in the packaging of illegal narcotics. These facts, taken in their totality, lead to a conclusion that Trooper Banovsky had reasonable suspicion to suspect that criminal activity was afoot. Thus, [the a]ppellant's first claim for relief fails.

*Rogers*, 849 A.2d at 1190.

In addition, evasive behavior is relevant in determining whether reasonable suspicion exists. *Illinois v. Wardlow*, 528 U.S. 119 (2000); *accord Commonwealth v. Freeman*, 757 A.2d 903, 908 (Pa. 2000) ("nervous, evasive behavior such as flight is a pertinent factor in determining reasonable suspicion"). *See also Commonwealth v. Zhahir*, 751 A.2d 1153, 1156 (Pa. 2000) (stating that the expectation of criminal activity in a given area and nervous or evasive behavior are factors). If a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search of the location where the hand movements occurred. *In Interest of 0.J.*, 958 A.2d 561 (Pa. Super. 2008) (*en banc*)…. Likewise, although presence in a high crime area or flight alone does not form the basis for reasonable suspicion, *Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999), a combination of these factors can be sufficient. *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *Zhahir*, 751 A.2d at 1157 (suspicious conduct corroborates anonymous tip).

In Appellant's case, the combination of these and the other factors set forth above provided the officers with reasonable suspicion that Appellant was involved in criminal activity.

Suppression Opinion, 8/7/18, 6-7.

We agree with the suppression court's analysis, and its conclusion that Officer Sulock possessed a reasonable suspicion that Appellant had been involved in the shooting based on the circumstances observed by the officer. Furthermore, because Appellant was seen fleeing from the location of the shooting in a vehicle, we disagree that the reasonable suspicion possessed by

the officer had dissipated once the frisk failed to uncover a weapon. It was reasonable for the officer to detain Appellant temporarily in the patrol vehicle while he continued to investigate by searching Appellant's vehicle from the outside with his flashlight. No additional level of suspicion was required to justify that limited investigation of Appellant's vehicle. *See Commonwealth v. Milyak*, 493 A.2d 1346, 1348 (Pa. 1985) (holding that "no search triggering the protection of the Fourth Amendment is conducted where an officer observes the plainly viewable interior of a vehicle[,]" even when that search is aided with a flashlight).

We also agree with the suppression court's analysis and conclusion regarding the subsequent search of Appellant's vehicle:

> With regard to the search of the car, under the facts and circumstances present herein, the police did not violate the law because they had sufficient probable cause to search the vehicle. Warrantless searches of cars and their occupants can be made only when there is independent probable cause to believe that weapons, contraband, or criminal evidence will be found therein. *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014) (plurality) (reaffirming ruling in *Commonwealth v. Smith*, 304 A.2d 456, 458 (Pa. 1973), that probable cause is necessary and sufficient to justify the search or seizure of an automobile in a public place); *Commonwealth v. Runyan*, 160 A.3d 831, 837 (Pa. Super. 2017). Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent individual in believing that an offense was committed and that the defendant has committed it. *Commonwealth v. Dennis*, 612 A.2d 1014, 1015-16 (Pa. Super. 1992)….
>
> Upon stopping Appellant for investigation, Officer Sulock went over to the vehicle Appellant had just exited and with the aid of a flashlight observed a fired cartridge case behind the driver's seat. The use of a flashlight did not constitute a search. *See* … *Milyak*[,

*supra*]…; ***Commonwealth v. Bentley***, 419 A.2d 85 (Pa. Super. 1980).

> Appellant then broke out of the police car he had been placed in and fled. The combination of these circumstances along with the evidence that Appellant had been driving the vehicle at a high rate of speed away from the site where there had been gun fire, Appellant's flight from the vehicle, and Appellant's blatant lie that he had not been driving the car, provided the police with probable cause to believe that the car contained contraband and justified their search of it. Thus, it is respectfully suggested that relief be denied with respect to this claim.

Suppression Court Opinion at 8-9. On this basis, we conclude that the search of Appellant's vehicle was also lawful.

Finally, Appellant contends that the seizure and subsequent search of his clothing for gunshot residue was unlawful, but he provides no separate analysis for that claim in the Argument section of his brief. Accordingly, we deem that aspect of his suppression claim waived. ***See Whitley***, ***supra***. In any event, had Appellant not waived this claim, we would agree with the suppression court that the seizure and search of Appellant's clothing was justified as a search incident to arrest. "Police may constitutionally seize a prisoner's clothing following arrest and detention without obtaining a search warrant." ***Commonwealth v. Hall***, 554 A.2d 919, 921 (Pa. Super. 1989).

Accordingly, we ascertain no error in the suppression court's denial of Appellant's motion to suppress the seized physical evidence.

Judgment of sentence ***affirmed***.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 8/23/2019*