J-S01037-25

2025 PA Super 37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARRYL WILLIAM METZ JR. | : | |
| | : | |
| Appellant | : | No. 900 MDA 2024 |

Appeal from the Judgment of Sentence Entered June 14, 2024
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003971-2022

BEFORE: NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED: FEBRUARY 19, 2025**

Darryl William Metz, Jr., appeals[1] from the June 14, 2024 amended aggregate judgment of sentence of 8 to 20 years' imprisonment, to be followed by 2 years' probation, imposed after he was found guilty in a bench trial of two counts of persons not to possess, use, manufacture, control, sell or transfer firearms; possession of firearm with altered manufacturer's number; five counts each of possession with intent to deliver a controlled

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant purports to appeal "from the judg[]ment of sentence entered in this matter May 23, 2024." However, where the trial court has amended a judgment of sentence during the period it maintains jurisdiction, as is the case here, a direct appeal lies from the amended judgment of sentence. **See Commonwealth v. Garzone**, 993 A.2d 306, 315 n.6 (Pa.Super. 2010), **affirmed**, 34 A.3d 67 (Pa. 2012). Accordingly, the appeal docket has been corrected to reflect this change.

substance ("PWID") and possession of a controlled substance; and possession

of drug paraphernalia.[2]  After careful review, we affirm.

The suppression court summarized the relevant factual findings of this

case as follows:

> In the summer of 2021, an anonymous tip led to the beginning of potential narcotics investigation into [Appellant]. Once police were able to corroborate an address for [Appellant] and vehicles connected to him, the investigation began to utilize Confidential Informants, culminating in three controlled buys of narcotics in October of 2022 from [Appellant]. Trooper Stephen DeAngeles observed at least one of the October hand-to-hand transactions between the confidential informant and [Appellant].
>
> On November 30, 2022, Trooper DeAngeles of the Vice Unit of the Pennsylvania State Police (PSP), while engaged in the undercover surveillance of [Appellant], observed him leaving his home. [Appellant] drove in his black Kia Forte to a Wawa, which was a meeting spot with a confidential informant [("CI")]. Trooper Justin Kline observed a hand-to-band transaction where the [CI] provided cash in exchange for heroin and/or fentanyl from [Appellant]. Trooper DeAngeles continued his surveillance of [Appellant] and followed him into a smoke shop in the city of Reading and then to the Sheetz in Richmond Township (at the intersection of Route 222 and Route 662). This surveillance revealed what appeared to be two additional hand-to-hand transactions. Trooper Kline communicated information about the surveillance of [Appellant] to uniformed state troopers, Trooper James Green and Trooper Zachary Goetter, and indicated that he wanted them to make contact with [Appellant] because drugs were likely to be found in the vehicle. He relayed information from Trooper

_____

[2] 18 Pa.C.S.A. §§ 6105(a)(1), 6110.2(a), 35 P.S. § 780-113(a)(30), (a)(16), and (a)(32), respectively.

DeAngeles about improper window tint on [Appellant's] vehicle. Trooper Kline went to the Reading barracks to prepare a search warrant for both the car and the house. Trooper DeAngeles continued his surveillance of [Appellant] from the Sheetz until he was stopped by the troopers in marked units.

The windows of the black Kia Forte were heavily tinted on both the rear and side windows. This was the basis for the traffic stop of [Appellant] performed by Trooper Green along Route 222 South, near Berks Memorial Gardens, in Maidencreek Township, Berks County, Pennsylvania. Trooper Goetter was present in a different marked vehicle. [Appellant] stopped near Trooper Goetter's vehicle. [Appellant] pulled over when Trooper Green activated the lights and siren on his marked patrol unit. Both Trooper Green and Trooper Goetter approached [Appellant's] car. He was asked for his documents and where he was coming from. He was told he was stopped for the window tint. He provided his documents and said he had been gambling at the Rutters, also located on Route 222. The troopers, based on the information from Trooper Kline, were aware that [Appellant] was actually coming from the Sheetz located on Route 222. Trooper Green indicated that [Appellant] appeared very nervous and was avoiding eye contact. The continued detention was based on his current demeanor when coupled with the information provided by Trooper Kline. He also had a large wad of cash on his person. Trooper Green asked him to step out of the vehicle. He was asked for consent to search his vehicle by Trooper Goetter. [Appellant] declined to give consent at that time.

Corporal [Anthony] Garipoli who was integral in the investigation of [Appellant] was separately present near the stop. He and Trooper DeAngeles approached [Appellant], Trooper Green and Trooper Goetter. Corporal Garipoli revealed to [Appellant] that they had been given information that he was selling drugs and that he had been followed all day. They offered [Appellant] an "opportunity to help" himself out. Trooper DeAngeles identified himself as a person

following [Appellant] that date. [Appellant] acknowledged having seen Trooper DeAngeles that day. Corporal Garipoli then indicated that police had the ability to get a warrant for the car and his house. He followed this assertion with the statement, "if we find what I think we will find, then there will be no opportunity." At this point [Appellant] agrees indicating, "I'll help myself; I have some pot."

At this point, Corporal Garipoli [] engage[d] in questioning of [Appellant] about what might be found in the car and home. Ultimately, consent to search his car was again requested and this time consent was granted. A roadside search of the vehicle occurred yielding various quantities of marijuana, cocaine, heroin, fentanyl, Xanax, and approximately $1800 in cash.

[Appellant] was handcuffed for transport back to his home at 126 Valley View in Tuckerton by Trooper Green. Having already been searched, a state trooper drove [Appellant's] car back to his residence. Corporal Garipoli arrived and verified with [Appellant] that no one else was inside the home and asked if they could go in and verify. [Appellant] agreed and identified the correct key to open the door. After clearing the home, they indicated that the case investigator was coming, and the investigator would bring him inside and ask him some questions. Again, he was asked if that was okay, and [Appellant] responded yes and asked for a cigarette.

Upon the arrival of Trooper Kline, [Appellant] now smoking a cigarette and making light conversation with other troopers present at the scene, was informed about the investigation and read his *Miranda*[3] rights. Trooper Kline asked him open ended questions at which time [Appellant] described the stop of his car, that he consented to a search of the car, that there were drugs in the car and that there

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 4 -

were also drugs in his home as well as firearms and cash. He further admitted that he could not legally possess firearms. Trooper Kline requested consent to search the residence. [Appellant] agreed and offered to point out where items were inside. [Appellant] was brought inside, and the residence was searched. Additional quantities of methamphetamine, marijuana, cocaine, heroin and fentanyl were found in the home, as well as a … sum of cash and two firearms. [Appellant] indicated to police that he wanted to 'help himself out'.

[Appellant] was transported to the Pennsylvania State Police Barracks at Reading where he was again interviewed. [Appellant] made various incriminating statements about his drug business walking through how it was structured as to pricing and supply as well as where and how he obtained the firearms.

Suppression court opinion, 7/18/24 at 3-6.

On July 3, 2023, Appellant filed an **omnibus** pretrial motion to suppress evidence and statements that he made during the search of his vehicle and home. The suppression court conducted hearings on Appellant's motion on October 23 and 31, 2023. On January 5, 2024, the suppression court denied Appellant's motion to suppress the evidence seized from his home and vehicle and denied his motion to suppress the statements he gave to Trooper Kline following the search of his home. The suppression court granted Appellant's motion to suppress the statements he gave to Corporal Garipoli for a lack of **Miranda** warnings. On March 5, 2024, Appellant filed a motion for reconsideration that was denied by the court on March 11, 2024.

On May 23, 2024, Appellant proceeded to a bench trial before the Honorable Thomas G. Parisi. That same day, Appellant was found guilty of

five counts each of possession of a controlled substance and PWID; two counts of persons not to possess, use, manufacture, control, sell or transfer firearms; possession of drug paraphernalia; and possession of firearm with altered manufacturer's number. As noted, the trial court sentenced Appellant to an aggregate term of 8 to 20 years' imprisonment, to be followed by 2 years' probation on May 23, 2024. On June 14, 2024, the trial court amended Appellant's judgment of sentence. Appellant did not file any post-sentence motions. This timely appeal followed on June 21, 2024.[4]

Appellant raises the following issues for our review:

[I.] Whether the court erred in denying Appellant's pretrial motion to suppress evidence when the justification for the initial traffic stop had been satisfied, and law enforcement lacked sufficient grounds to extend the stop or detain Appellant for further investigation of additional alleged criminal activities[?]

[II.] Whether the court erred in denying Appellant's pretrial motion to suppress physical evidence under the independent source doctrine where law enforcement failed to obtain a search warrant, and the taint of improper custodial statements was not cured by subsequent *Miranda* warnings, all of which were the result of the initial unlawful detention and coerced statements[?]

Appellant's brief at vii (extraneous capitalization omitted).

## I.

_____

[4] Appellant and the trial court have complied with Pa.R.A.P. 1925.

- 6 -

Appellant first argues that the suppression court erred in denying his suppression motion because the Troopers did not possess reasonable suspicion to "prolong the traffic stop or detain [him] for further investigation" following the stop of his vehicle for a suspected violation of the Motor Vehicle Code ("MVC").[5] *Id.* at 7-17.

Our standard of review in addressing a challenge to a denial of a suppression motion is well settled.

> [Our] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 121 A.3d 524, 526 (Pa.Super. 2015) (citation omitted; brackets in original), *appeal denied*, 135 A.3d 584 (Pa. 2016).

"Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution guarantee an individual's freedom from unreasonable searches and seizures." *Commonwealth v.*

---

[5] The record reflects that Trooper Green conducted a traffic stop of Appellant's vehicle for a suspected violation of 75 Pa.C.S.A. § 4107(b)(2) of the MVC, for extremely dark window tint.

**Bostick**, 958 A.2d 543, 550 (Pa.Super. 2008) (citation and internal quotation marks omitted), **appeal denied**, 987 A.2d 158 (Pa. 2009). "To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." **Commonwealth v. Reppert**, 814 A.2d 1196, 1201 (Pa.Super. 2002) (citation omitted).

This court has recognized three types of interactions between members of the public and the police:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

**Commonwealth v. Way**, 238 A.3d 515, 518 (Pa.Super. 2020) (citation omitted). Thus, pursuant to the Fourth Amendment, a person may not be lawfully seized, either by means of an investigative detention or a custodial detention, unless the police possess the requisite level of suspicion.

Here, the crux of Appellant's claim is that the Troopers' continued interaction with him after the reason for the initial traffic stop was satisfied transitioned the stop into an unlawful investigative detention. Appellant's brief at 7-17.

It is well settled in this Commonwealth that,

> [a] police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004).

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the United States Supreme Court examined the permissible scope of an officer's investigation during a traffic stop. The *Rodriguez* Court reasoned:

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] stop ... than to a formal arrest. Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission — to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed.

*Rodriguez*, 575 U.S. at 354 (citations and internal quotation marks omitted).

The **Rodriguez** Court recognized that police officers may conduct certain unrelated checks during an otherwise lawful traffic stop, provided they "not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." **Id.** at 372.

Likewise, in **Rogers**, our Supreme Court held that a trooper had reasonable suspicion to continue to detain a [Appellant] beyond the initial traffic stop, where the [Appellant], **inter alia**, was extremely nervous and shaking; gave vague answers to the trooper's questions; and his vehicle contained supplies which the trooper knew from experience were used in the packaging and distribution of narcotics. **Rogers**, 849 A.2d at 1189–1190. The **Rogers** Court acknowledged that although there could be innocent explanations for these circumstances, "reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further[, but rather] requires a suspicion of criminal conduct that is reasonable based upon the facts of the matter." **Id.** at 1190 (emphasis omitted).

Similarly, our review of the totality of the circumstances in the instant matter supports the conclusion that the Troopers possessed reasonable suspicion to extend the traffic stop to investigate whether Appellant was engaged in criminal activity, namely possession of a controlled substance.

The record reflects that on November 30, 2022, members of the PSP Vice Unit were engaged in the undercover surveillance of Appellant's residence

in connection with an ongoing narcotics investigation that began in 2021. Notes of testimony, 10/23/23 at 8, 12. Appellant was observed leaving his residence in black Kia Forte with extremely dark window tint and driving to a Wawa, were Trooper Kline observed him engage in a controlled buy of heroin and fentanyl with a CI. **Id.** at 13, 52, 54. Trooper DeAngeles continued his surveillance of Appellant and observed him engage in what appeared to be — based upon his training and experience — two additional hand-to-hand narcotics transactions at a smoke shop and a Sheetz. **Id.** at 52. Based on these observations, Trooper Kline contacted Troopers Green and Goetter and instructed them to stop Appellant's vehicle. **Id.** at 14-15, 32, 34. Specifically, Trooper Kline informed Troopers Green and Goetter about the details of the three suspected narcotics transactions, as well as the vehicle's improper window tint. **Id.** at 34.

Thereafter, Trooper Green stopped Appellant's vehicle on Route 222 South in Berks County for a suspected violation of the MVC, after he observed its "heavily tinted windows." **Id.** at 33-34; **see also** 75 Pa.C.S.A. § 4107(b)(2). During the course of Trooper Green's investigation of the traffic violation that warranted the initial stop, he observed that Appellant was very nervous, refused to make eye contact, and had "a large wad of cash on his person." Notes of testimony, 10/23/23 at 34-35. As noted, at the time of the traffic stop, Trooper Green was fully aware of Appellant's drug activity that immediately preceded this stop. Trooper Green further testified that Appellant

told him that he was coming from gambling at Rutters, which Trooper Green knew to be a lie based upon the prior surveillance. *Id.* at 34.

It is well settled in this Commonwealth that Trooper Green was warranted to use information gathered during his initial traffic stop to justify a second investigatory detention. *See Rogers*, 849 A.2d at 1190. We find that Trooper Green's initial interaction with Appellant seamlessly transitioned into a second, investigative detention whereby he sought to ask additional questions of Appellant on account of his reasonable suspicion Appellant was in possession of a controlled substance. Accordingly, we discern no error on the part of the suppression court in denying Appellant's suppression motion on this basis.

## II.

Appellant next argues that the suppression court erred in denying his suppression motion because his consent to search his vehicle and home was the product of coercion. Appellant's brief at 18. Appellant avers that he cannot be found to have validly consented to the search when, prior to giving his consent, the police advised him that they would apply for a warrant if he denied them permission to search. *Id.* For the following reasons, we disagree.

"As a general rule, a warrant stating probable cause is required before a police officer may search for or seize evidence." *Commonwealth v. Heidelberg*, 267 A.3d 492, 502 (Pa.Super. 2021) (*en banc*) (citation and

internal quotation marks omitted), ***appeal denied***, 279 A.3d 38 (Pa. 2022). "Absent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable." ***Id.*** (citation omitted). "One such exception is consent, voluntarily given." ***Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000). "Whether an individual has voluntarily consented to a search is [a question of] fact which must be determined in each case from the totality of the circumstances." ***Commonwealth v. Rosas***, 875 A.2d 341, 349 (Pa.Super. 2005) (citation and internal quotation marks omitted), ***appeal denied***, 897 A.2d 455 (Pa. 2006).

The Commonwealth bears the burden of proving "that a consent is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or implied, or a will overborne — under the totality of the circumstances." ***Commonwealth v. Powell***, 994 A.2d 1096, 1101-1102 (Pa.Super. 2010) (citation omitted), ***appeal denied***, 13 A.3d 477 (Pa. 2010). In assessing the voluntariness of consent, this Court has set forth several factors:

> 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

*Id.*

Instantly, the record reflects that Appellant initially declined to consent to a search of his vehicle by Troopers Green and Goetter. Notes of testimony, 10/23/23 at 35. Once consent was declined, Corporal Garipoli and Trooper DeAngeles approached Appellant and informed him that he had been under narcotics surveillance the entire day, they had everything they needed to get a search warrant for his vehicle and home, and they were seeking his cooperation. *Id.* at 55-56; notes of testimony, 10/31/23 at 8-10. Corporal Garipoli further informed Appellant that Trooper Kline was currently in the process of preparing search warrants for his vehicle and home based upon their observations. Notes of testimony, 10/31/23 at 10-11. It was after this conversation that Appellant indicated that he wished to "help himself" and consented to a search. *Id.*

The suppression court found that, under the totality of the circumstances, Appellant's consent to the search was voluntary and "not the product of coercion." Suppression court opinion, 7/18/24 at 7. In reaching this conclusion, the suppression court reasoned as follows:

> Determining whether consent was obtained voluntarily is an objective inquiry which requires an evaluation of the totality of the circumstances. [Appellant's] consent to search the car, and later his home, was not the product of coercion. A suspect's decision to waive a constitutional right cannot be made involuntary purely because of the fact that it was preceded by the lawful explanation of the potential legal consequences of failing to do so. The explanation from Corporal Garipoli about the

- 14 -

> investigation that had occurred leading up to the car stop and that there was an intention to seek a search warrant for both the car and home of [Appellant], after the earlier refusal to consent, did not create a coercive atmosphere. The Commonwealth has met their burden to demonstrate that the consent was the product of a free and unconstrained choice, rather than the result of duress, coercion, or a will overborne.
>
> . . . .
>
> While certain statements to Corporal Garipoli were improperly obtained, any taint is purged as to both the search of the car and home under the independent source doctrine and firmly rooted in the probable cause obtained by the surveillance of [Appellant] leading to the stop of the car.

*Id.* at 10-12 (case citations omitted).

Following our careful review, we agree with this assessment. The record reflects that at the time of the traffic stop, neither Trooper Green nor Goetter informed Appellant that he was under arrest or placed him in handcuffs. Notes of testimony, 10/23/23 at 36. Appellant was also not handcuffed or placed under arrest during his subsequent conversation with Corporal Garipoli and Trooper DeAngeles and there is no evidence in the record that any of the troopers drew their firearms. Notes of testimony, 10/31/23 at 11. We reject the notion that a suspect's consent to search is rendered ***per se*** involuntary in situations where the police merely advise the suspect that they have enough information to get a search warrant should he refuse the search. As our Supreme Court has explained, a statement by law enforcement that they could apply for a warrant if denied permission to search "is merely a factor, but not

- 15 -

a dispositive one, in the totality of the circumstances that a court must review in determining whether the police coerced the individual into consenting to the search." **See Commonwealth v. Mack**, 796 A.2d 967, 971 (Pa. 2002).

In reaching this decision, we emphasize that it is well settled in this Commonwealth that "[i]f the discovery of evidence can be traced to a source independent of the initial illegality, however, suppression is not mandated." **Commonwealth v. Abbas**, 862 A.2d 606, 610 (Pa.Super. 2004) (citation omitted). This Court has further recognized that evidence seized without a warrant will not be suppressed where the Commonwealth shows by a "preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means[.]" **Commonwealth v. King**, 259 A.3d 511, 522 (Pa.Super. 2021) (citation omitted); **see also Commonwealth v. Burton**, 234 A.3d 824, 834 (Pa.Super. 2020) (stating, "evidence tainted by illegal police conduct such as an unlawful seizure nevertheless may be admitted into evidence if the evidence can be fairly regarded as having an origin independent of the unlawful conduct." (citation and parentheses omitted)), **appeal denied**, 252 A.3d 234 (Pa. 2021).

In the case **sub judice**, the record reflects that Appellant was the target of an ongoing narcotics investigation and was observed by law enforcement on the day in question leaving his home in his vehicle and engaging in the 3 separate narcotics transactions, one of which involved a CI. **See** notes of

testimony, 10/23/23 at 11-14, 50-53; notes of testimony, 10/31/23 at 6-7. Thus, it is clear that the Commonwealth would have inevitably obtained a search warrant and discovered the contraband in Appellant's vehicle and home, irrespective of whether he consented to the search.

Based on the foregoing, we discern no error on the part of the suppression court in denying, in part, Appellant's pretrial suppression motion. Accordingly, we affirm the June 14, 2024 judgment of sentence.

Judgment of sentence affirmed.

Judge King joins.

Judge Nichols concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/19/2025